## FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KELLY A. MIKLOS**
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**MATTHEW D. ANGLEMEYER**
Marion County Public Defender
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1303-CR-235 |
| | ) | |
| DEANGELO BANKS, | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Grant W. Hawkins, Judge
Cause Nos. 49G05-1012-MR-91655, 49G05-1012-MR-91656

**January 23, 2014**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

The State appeals the trial court's grant of DeAngelo Banks's motion to suppress his confession of murder. The State raises one issue which we revise and restate as whether the court erred in granting Banks's motion to suppress. We affirm.

FACTS AND PROCEDURAL HISTORY

In November 2010, Banks arrived at the New Castle Correctional Facility and was placed in the psychiatric ward of the facility. He had been previously diagnosed with schizo affective disorder. On December 7, 2010, Indianapolis Police Detective Michael Mitchell went to the New Castle Facility to question Banks and to follow up on an investigation involving a DNA lead. Detective Mitchell had no previous contact with Banks, was not aware that Banks was in the psychiatric ward or that he was medicated, and had not spoken with any medical personnel concerning him. Rather, Detective Mitchell simply made an appointment to speak with Banks, was greeted by security personnel, and was placed in a room with Banks.

Detective Mitchell asked the correctional officer to place the handcuffs which were behind Banks's back to his front so that he could sign the rights waiver form, but the correctional officer refused. Banks spelled his name for Detective Mitchell, and the following exchange then occurred:

Q. Okay. Before we get started, I'm gonna read you your rights.

A. Alright.

Q. And you have the right to remain silent. Anything you say can be used against you as evidence in court. You have the right to talk a [sic] lawyer before any questions are asked or – you may answer any questions. Do you understand that?

A. Yes, sir.

2

Q. Okay. If you cannot afford a lawyer, one will be appointed before you for any further questioning if you stop answering, okay?

A. Okay.

Q. And if you decide to answer questions now without a lawyer, you have the right to stop answering at any time until you talk to a lawyer. Do you understand that? You don't have to talk to me is what I'm sayin'.

A. Oh, yeah, alright.

Q. You have – and if you do talk to me, you have the right to stop any time.

A. Alright.

Q. Okay?

A. Yeah.

Q. And that's for you. Do you know Margaret – do you want to talk to me today?

A. Yes, sir.

Q. Okay. I know you can't sign the rights waiver 'cause you're handcuffed but –

A. Yeah, I agree.

Q. – We'll put that – we'll put that in the –

A. I agree.

State's Exhibit 2 at 2-3.

Detective Mitchell then questioned Banks, and Banks indicated that he remembered the picture of Margaret Russell, that he knew her for about an hour, and that he was in Oaktree Apartments in September the year before last. Banks then stated: "I

3

was under an influence of cocaine and – she – she was out prostitutin'. And – I don't know what happened, man, it's like – it's like for some reason, man, I – I seduced her and it ended up to a murder, right?" Id. at 4. Banks stated that he strangled her with his hands and explained how he strangled her. When asked whether he had sex with her, Banks said: "Yea, a dead body, too, right?" Id. Banks stated that he took off her shirt and wiped his semen and her fluids, and that the whole thing took "[p]robably like – fifteen minutes" then said "[n]aw, it was longer than that. Because after she was – spiritually dead – her soul hadn't left her body yet, though, right?" Id. at 5. He also said that he killed "some lady on 17th street . . . [and] Ritter" around November of 2009 and that he strangled her and then had sex with her dead body. Id. at 5-6. When asked "is there any particular reason you killed these girls," Banks answered: "Other than I was under the influence of drugs, man, I – I've been – I've been psychologically tormented, right? I don't know what's – what the problem is, man. I think I might be insane or somethin', right?" Id. at 7. The day after Detective Mitchell spoke with Banks, Dr. Maguire informed another detective who wanted to speak to Banks that "it might be more productive to come after his medication had stabilized, because he had been out of it." Transcript at 23.

On December 27, 2010, the State charged Banks with the murder of Russell under cause number 49G05-1012-MR-91655 ("Cause No. 55") and the murder of Debra Harper under cause number 49G05-1012-MR-91656 ("Cause No. 56"). On February 16, 2011, the State alleged that Banks was an habitual offender under each cause number.

On December 1, 2011, Banks filed a motion to suppress a statement he gave to Detective Robert Flack on December 18, 2010, and testimony relating thereto in Cause No. 56.

On March 23, 2012, Banks filed a motion to suppress his statement to Detective Mitchell and testimony related thereto in Cause No. 55, and alleged that

> due to the confusing manner in which these rights were stated to him by Detective Mitchell and the defendant's altered and compromised state of mind, produced by a combination of psychotropic medications that he had been administered during his incarceration at the facility, including December 7, 2010, his "waiver" of those [Miranda] rights was not freely self-determined and the product of rational intelligent and free will, i.e. the statement was not made voluntarily, intelligently and knowingly due to the impairment of his mental faculties.

Appellant's Appendix at 51-52.

On December 7, 2012, the court held an evidentiary hearing. Dr. Ellen Keris Maguire, a psychologist working in the psychiatric ward of the New Castle Correctional Facility, testified that she saw Banks "weekly at the beginning and then it tapered off." Transcript at 10. She testified that he had previously been diagnosed with schizo affective disorder, which she described as:

> A psychotic disorder that also has some mood systems, so it's kind of a combination of schizophrenia and bi-polar disorder. So there you have delusions, hallucinations, and then at the same time you can have periods where your mood is extremely euphoric and high and you're up for several days and then you can also have a period of depression.

Id. at 11. According to Dr. Maguire, Banks was significantly worse when he arrived in November 2010 than later in his confinement. She noted that the day after Detective Mitchell spoke with Banks, she informed another detective that "it might be more productive to come after his medication had stabilized, because he had been out of it."

5

Id. at 23.  She testified that her opinion would have been the same the day before.  She further stated that "closer to March or April [Banks] was consistently stable."  Id. at 24.

Detective Mitchell testified that he introduced himself to Banks, told Banks that he was there to talk about a case, and Banks told him that he knew why he was there.  He stated that Banks began talking about the murders, and he stopped Banks from talking and turned on his tape recorder.  Banks "seemed to understand" why Detective Mitchell was there before being told and that it was "indicative of the whole conversation that [Banks was] understanding what [he was] talking about."  Id. at 51.  When asked "[s]o you didn't have to in anyway [sic] to I'll use the term, use any coercive tactics to get him to talk to you, he wanted to talk to you from the get go," Detective Mitchell answered, "Absolutely, yeah."  Id.  He acknowledged that the correct statement to Banks should have been that if he cannot afford a lawyer one would be appointed to him before any further questioning, and that he did not read the Indianapolis Metropolitan Police Advice of Rights Waiver verbatim to Banks.  He also testified that Banks's answers during the interview were appropriate to the questions, that Banks did not laugh inappropriately during the questioning and did not do anything that seemed "highly . . . inappropriate to the conversation."  Id. at 48.  On re-cross examination, in response to the question, "Now December 7 of 2010 that the defendant understood his rights and did in fact want to waive them and talk to you about what occurred" he responded, "Yes, that's correct."  Id. at 54-55.

Banks testified that he was still medicated the day of the evidentiary hearing and that he understood what was happening at the hearing.  He testified that he vaguely

6

remembered the day when Detective Mitchell came to talk to him, and when asked whether he recalled Detective Mitchell advising him of his rights, answered: "Not really, no." Id. at 56. Banks stated that he did not really understand that he had certain rights that he could invoke so as to not give a statement and he "thought [Detective Mitchell] was telling [him] something totally different." Id. at 57. He said that he did not know that he had the right to talk to a lawyer before he talked to the detective, and that he interpreted the words "further questions" as Detective Mitchell "telling [him] like I would get a lawyer like right now like before he asked me questions." Id. When asked why he agreed to talk with Detective Mitchell, Banks replied: "I was in restraints. They had me restrained down. It's real vague. I was kind of like in and out of it." Id. at 58. He also indicated that had he been clearly advised, he would not have given up his rights and talked to Detective Mitchell.

At the end of the hearing, the court stated:

Let me outline the problem that I see. Then you folks can tell me your thoughts. We might need to get some more scholarship in here. When a person has processing difficulty, cognizant difficulty, it takes more care rather than less care to make sure the person understands what he or she is doing and the consequences of the acts. When you put that in the context of a rights waiver, we recognize that the advisement of rights is one factor, the waiver of rights is another factor. The waiver can be seen to occur even when it's not expressed. Some cases because the person keeps on answering the questions even though the waiver itself might be unclear. The fact that he keeps on answering the question suggests strongly that they are waiving their rights and they are doing it unknowingly. But when you have processing and cognitive issues how do you look at it? We have a defendant who was trying to talk to the detective before the detective even had his seat warm. The detective took great care to make sure that we do this as fairly as we can, under the then known circumstances. But all of the then known circumstances, all the existing circumstances were known. Didn't know about the man's placement in the psychiatric wing, didn't know the kind of treatment he was getting, didn't know that he had

7

problems processing and remembering correctly. So can we assume a knowing and intelligent waiver under those circumstances when the advisement is not totally correct. And the waiver – the express waiver is nonexistent, but an implied waiver might exist because he did answer the questions. Does that make any sense to you, [prosecutor], my concern?

\* \* \* \* \*

I don't know of any Indiana cases, but there might be several. But I need some help with that issue. It's the State's burden. If you have a signed waiver it's clear that he's been advised and there is a knowing waiver. We don't have that here. We don't even have a complete according to the court order – document, advisement, certainly we don't have a signed waiver. So I need something from you to direct me to the conclusion you want me to reach.

Id. at 62-63. The court later stated:

[Detective Mitchell] didn't knowingly do anything wrong. But probably could have read something a little bit better, but he wasn't in there trying to fool anybody. But at the same time he did not know Mr. Banks [sic] condition.

\* \* \* \* \*

I suspect if [Detective Mitchell] had known he would have had some safeguards in the whole process, but he didn't. Now Mr. Banks goes ahead and answers the questions even though the advisement wasn't necessarily as clear as it could have been, certainly not as complete based on the documentation usually is, and the waiver was not as expressed as it could have been. In spite of those things we have a knowing and voluntary waiver such that you can proceed to trial. The greater problem a person has, the greater the care you have to take to make sure it's a knowing and voluntary waiver. This person has more deficits than normal, you have to take greater care.

Id. at 68-69.

On January 24, 2013, the State filed a response to Banks's motion to suppress in Cause No. 55. On February 14, 2013, Banks filed an answer to the State's response to his motion to suppress. He argued that his mental state and the statements by Detective

8

Mitchell led "to an invalid and involuntary waiver" and that Article 1, Section 14 of the Indiana Constitution required the State to prove beyond a reasonable doubt that his statement was voluntary. Appellant's Appendix at 70. He contended that Detective Mitchell's failure to simply read the rights form resulting in his incomplete and confusing recitation of his rights can be characterized as other improper police influences even if they were not intentional and that it led to the production of an involuntary confession.

On February 15, 2013, the court held a hearing, found that Banks's waiver was not knowing, and granted the motion to suppress. In March 2013, the State filed a motion to dismiss the charges under each cause number, and the court granted the motions.

## DISCUSSION

The issue is whether the court erred in granting Banks's motion to suppress his confession of murder.[1] "In reviewing a trial court's motion to suppress, we determine whether the record discloses 'substantial evidence of probative value that supports the trial court's decision.'" State v. Renzulli, 958 N.E.2d 1143, 1146 (Ind. 2011) (quoting State v. Quirk, 842 N.E.2d 334, 340 (Ind. 2006)). We do not reweigh the evidence, but consider conflicting evidence most favorably to the trial court's ruling. Id. Within this sufficiency review, we review all issues of law *de novo*. Hartman v. State, 988 N.E.2d 785, 788 (Ind. 2013). "When the State appeals from a negative judgment, as here, it 'must show that the trial court's ruling on the suppression motion was contrary to law.'" Renzulli, 958 N.E.2d at 1146 (quoting State v. Washington, 898 N.E.2d 1200, 1203 (Ind. 2008), reh'g denied).

---

[1] Pursuant to Ind. Code § 35-38-4-2(5), the State appeals from the suppression of evidence which effectively precludes further prosecution.

The State argues that (A) Detective Mitchell sufficiently advised Banks of his rights; and (B) that Banks waived his rights and voluntarily confessed. We will address each issue separately.

A.    Advisement of *Miranda* Rights

The Fifth Amendment grants to individuals, among other rights, the right to be free from self-incrimination. U.S. CONST. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."). This provision applies to the states by virtue of the Fourteenth Amendment. Hartman, 988 N.E.2d at 788 (citing Malloy v. Hogan, 378 U.S. 1, 6, 84 S. Ct. 1489, 1492, 12 L.Ed.2d 653, 658 (1964)). The United States Supreme Court has held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." Miranda v. Arizona, 384 U.S. 436, 478, 86 S. Ct. 1602, 1630 (1966). The Supreme Court held that "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today." Id. at 469, 86 S. Ct. at 1625. The Court also held that "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation . . . ." Id. at 471, 86 S. Ct. at 1626. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. Id. at 478-479, 86 S. Ct. at 1630. The person must be warned prior to any questioning

that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Id. at 479, 86 S. Ct. at 1630.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  Id.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.  Id.

In determining whether police officers adequately conveyed the four warnings, reviewing courts are not required to examine the words employed as if construing a will or defining the terms of an easement.  Florida v. Powell, 559 U.S. 50, 60, 130 S. Ct. 1195, 1204 (2010).  Rather, the inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by Miranda.  Id.  "There is no formal requirement for how the State must meet its burden of advising an individual consistent with Miranda, so this court examines the issue in light of the totality of the circumstances."  State v. Keller, 845 N.E.2d 154, 161 (Ind. Ct. App. 2006).

The State argues that the trial court did not identify any specific error, omission, or mistake in the Miranda advisement given to Banks, but found generally that "the advisement wasn't necessarily as clear as it could have been, certainly not as complete based on the documentation usually is."  Appellant's Brief at 13 (quoting Transcript at 69).  The State contends that Detective Mitchell informed Banks in a straightforward manner of all of the advisements required by Miranda.

11

Banks concedes that Detective Mitchell advised him about his right to remain silent and that anything he said could be used against him, but argues that the advice regarding the right to the presence of counsel was "highly abstruse" and that the words used by Detective Mitchell were very confusing. Appellee's Brief at 11. Banks focuses on the following statement made by Detective Mitchell: "If you cannot afford a lawyer, one will be appointed before you for any further questioning if you stop answering, okay?" State's Exhibit 2 at 2. Banks emphasizes the words "if you stop answering" in his brief and argues that "[t]he most logical interpretation of these words is that Mitchell told Banks a lawyer would be appointed for him *only if* he began answering Mitchell's questions and then stopped." Appellee's Brief at 11. He points out that Detective Mitchell told him that a lawyer would be appointed "before you," and argues "[w]hat appointing a lawyer 'before you' means, and what Banks took it to mean, cannot be determined." Id. at 11-12. He asserts that "[w]hen and for how long Banks had a right to an attorney was not made clear" and that he "could not have understood from these advisements that he could exercise his right to an attorney while the interrogation was underway" or that "he could choose to talk only with Counsel present." Id. at 12. He also contends that Detective Mitchell's statement was "too convoluted to inform Banks that he had a right to an attorney before any questioning," and that the detective's statement to him that he had "the right to talk to a lawyer before any questions are asked or – you answer any questions" did not inform him he had a right to an appointed attorney before any questioning. Id.

The record reveals that Detective Mitchell's advisement did not inform Banks that he had the right to have counsel present during the questioning at issue and thus failed to properly advise Banks of his <u>Miranda</u> rights. <u>See</u> <u>Franklin v. State</u>, 262 Ind. 261, 264, 314 N.E.2d 742, 744 (1974) ("[T]he <u>Miranda</u> case requires that the precautionary warnings clearly express that an individual has the right to consult with a lawyer *and to have the lawyer with him during interrogation*.") (emphasis added); <u>United States v. Wysinger</u>, 683 F.3d 784, 799 (7th Cir. 2012) (concluding that the "agent's divergence from the familiar script would put a suspect to a false choice between talking to a lawyer before questioning or having a lawyer present during questioning, when <u>Miranda</u> clearly requires that a suspect be advised that he has the right to an attorney both before and during questioning").

B.     <u>Waiver of *Miranda* Rights and Confession</u>

The State argues that Banks never demonstrated confusion, that he verbally indicated that he understood the advisements recited by the detective, and he validly waived his rights. The State points to the court's statement that the confession would have been admissible if Detective Mitchell would have taken more care with Banks given his mental condition but that "this standard far exceeded that which the State was required to show in order to establish a valid waiver and statement." Appellant's Brief at 16. The State also posits that "the trial court's concerns are relevant for the parties to argue before the jury when addressing the evidentiary weight of the statement and are not relevant on the question of admissibility of the statement itself." <u>Id.</u> The State further contends that the "signs Dr. Maguire identified that could indicate whether Banks was not

13

coherent or oriented during the statement were not exhibited during the statement such as inappropriate laughter or bizarre behavior" and notes that Banks was familiar with the criminal justice system as evidenced by his incarceration for a rape conviction at the time of the statement. Id. at 19. The State describes the conversation between Detective Mitchell and Banks as "cordial, short, and to the point," and maintains that Detective Mitchell had no knowledge of Banks's diagnosis or his placement in the psychiatric ward of the jail and there is nothing showing that he attempted to take advantage of it. Id. at 20.

Banks concedes that it is clear that under the United States Constitution a person's mental or physical condition alone will not render a person's confession involuntary and that coercive police activity is a necessary prerequisite to a finding that the confession is involuntary, but argues that the Indiana Constitution does not require police coercion in order to show involuntariness. He cites Hurt v. State, 694 N.E.2d 1212 (Ind. Ct. App. 1998), trans. denied, cert. denied, 525 U.S. 1008, 119 S. Ct. 525 (1998), and argues that "*Hurt* quoted with approval Justice DeBruler's concurring opinion in *Linthicum v. State*, 511 N.E.2d 1026, 1031 (Ind. 1987), in which Justice DeBruler noted that the Indiana Constitution, unlike the federal constitution, does not require proof of police coercion to render a defendant's confession involuntary." Appellee's Brief at 14. Banks argues that Dr. Maguire indicated that he had poor insight, judgment, reasoning, and impulse control, as well as paranoia and delusions which militate against a voluntary statement. He also contends that the police report cited by the State to suggest his familiarity with the

14

criminal justice system was never introduced into evidence at any hearing and it should not be a part of the analysis.

In its reply brief, the State argues that coercive police activity is a necessary prerequisite to establish a violation of the Fifth Amendment of the United States Constitution and Article 1, Section 14 of the Indiana Constitution. The State asserts that nowhere in <u>Hurt</u> did the court state that proof of police coercion is not required under the Indiana Constitution. The State posits that Banks's reliance on Justice DeBruler's concurring opinion in <u>Linthicum</u> is misguided because it is only a concurring opinion that was never adopted by the Indiana Supreme Court, and the Court's opinion in <u>Ajabu v. State</u>, 693 N.E.2d 921 (Ind. 1998), suggests otherwise. The State argues that Banks is asking this court to essentially find that a showing of a pre-existing mental or physical condition, absent all other factors, would be sufficient to render a confession involuntary and that "[t]his would imply that any defendant who can show he has some kind of mental condition could never 'voluntarily' give a confession to the police." Appellant's Reply Brief at 10.

With respect to a waiver of <u>Miranda</u> rights, such a waiver occurs when a defendant, after being advised of those rights and acknowledging an understanding of them, proceeds to make a statement without taking advantage of those rights. <u>Treadway v. State</u>, 924 N.E.2d 621, 635 (Ind. 2010); <u>Crain v. State</u>, 736 N.E.2d 1223, 1230 (Ind. 2000). In judging the voluntariness of a defendant's waiver of rights, we will look to the totality of the circumstances to ensure that a defendant's self-incriminating statement was not induced by violence, threats, or other improper influences that overcame the

15

defendant's free will. Crain, 736 N.E.2d at 1230. The State bears the burden of proving beyond a reasonable doubt that the defendant voluntarily waived his rights. Pruitt v. State, 834 N.E.2d 90, 114-115 (Ind. 2005), reh'g denied, cert. denied, 548 U.S. 910, 126 S. Ct. 2936 (2006).[2]

To the extent that Banks argued in his motion to suppress that his confession was not voluntary, we observe that Article 1, Section 14 of the Indiana Constitution provides that "[n]o person, in any criminal prosecution, shall be compelled to testify against himself." In addition to the required Miranda advisement, a defendant's self-incriminating statement must also be voluntarily given. Crain, 736 N.E.2d at 1230 (citing Gregory v. State, 540 N.E.2d 585, 592 (Ind. 1989); Dickerson v. United States, 530 U.S. 428, 120 S. Ct. 2326, 2336, 147 L.Ed.2d 405 (2000) ("The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry.")). The trial court's decision regarding admissibility of a confession or incriminating statement is controlled by determining from the totality of the circumstances whether the statement was given voluntarily, rather than through coercion or other improper influence so as to overcome the free will of the accused. Hartman, 988 N.E.2d at 787-788; see also Treadway, 924 N.E.2d at 635 (holding that the admissibility of a statement is controlled by determining from the totality of the circumstances whether it was made voluntarily and not induced by violence, threats, or other improper influences that overcame the

---

[2] In Pruitt, the Court held that "[a] defendant must show specific instances where his impaired abilities have an effect on voluntariness in order for a defendant to prevail on a claim that his mental condition prevented him from knowingly waiving his Miranda rights." 834 N.E.2d at 115. However, in Pruitt, the trial court denied the defendant's motion to suppress, and it was the defendant's burden on appeal to show that the trial court had erred. The trial court here granted Banks's motion to suppress, and Banks has no such burden on appeal.

16

defendant's free will); Griffith v. State, 788 N.E.2d 835, 841 (Ind. 2003) (holding that admissibility of a confession is governed by determining from the totality of the circumstances whether or not it was made voluntarily). Standard indicators for voluntariness include whether the confession was freely self-determined, the product of a rational intellect and free will, without compulsion or inducement of any sort, and whether the accused's will was overborne. Griffith, 788 N.E.2d at 841. "The mere fact a statement is made by the defendant while under the influence of drugs, or that the defendant is mentally ill, does not render it inadmissible per se." Pruitt, 834 N.E.2d at 115 (citing Brewer v. State, 646 N.E.2d 1382, 1385 (Ind. 1995)). "Intoxication, drug use and mental illness are only factors to be considered by the trier of fact in determining whether a statement was voluntary." Id. The State also bears the burden of proving beyond a reasonable doubt that the defendant's confession was voluntarily given.[3] Pruitt, 834 N.E.2d at 114-115.

We initially address the parties' disagreement regarding whether coercive police activity is a necessary prerequisite to establish a violation of Article 1, Section 14 of the

---

[3] In Pruitt, the Indiana Supreme Court observed:

> If a defendant challenges the voluntariness of a confession under the United States Constitution, the state must prove the statement was voluntarily given by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 167-69, 107 S. Ct. 515, 93 L.Ed.2d 473 (1986) (voluntariness of waiver of Miranda rights); Lego v. Twomey, 404 U.S. 477, 488-89, 92 S. Ct. 619, 30 L.Ed.2d 618 (1972) (voluntariness of a confession). Thus, a federal constitutional claim that a confession was not voluntarily given is governed by a preponderance of the evidence standard. Henry v. State, 738 N.E.2d 663, 664 n.1 (Ind. 2000). However, the Indiana Constitution requires the state to prove "beyond a reasonable doubt that the defendant voluntarily waived his rights, and that the defendant's confession was voluntarily given." Miller v. State, 770 N.E.2d 763, 767 (Ind. 2002) (quoting Schmitt v. State, 730 N.E.2d 147, 148 (Ind. 2000)).

Pruitt, 834 N.E.2d at 114-115. As noted, Banks raised an issue under Article 1, Section 14 of the Indiana Constitution.

Indiana Constitution. In <u>Linthicum v. State</u>, 511 N.E.2d 1026, 1027 (Ind. 1987), the Court addressed whether the statement of Philip Linthicum to police was voluntarily given. Linthicum argued that he was intoxicated and under the influence of drugs at the time of his statement and that the Fifth and Fourteenth Amendments to the United States Constitution required exclusion of his statement. 511 N.E.2d at 1030. The Court held that Linthicum's argument did not address the main concern of due process analysis in this area: coercive police conduct. <u>Id.</u> The Court discussed <u>Colorado v. Connelly</u>, 479 U.S. 157, 107 S. Ct. 515 (1986), and held that "[a]bsent evidence of oppressive police conduct, the Fifth Amendment does not require suppression of Linthicum's statement." <u>Id.</u> In an opinion in which Justice DeBruler concurred in result, he wrote:

> It is also appropriate at this initial visitation with <u>Connelly</u> to express the opinion that the case does not bind this court in applying the protections of the Indiana Constitution, applicable in the police interrogation area. The constitutional test of voluntariness under the Indiana Constitution requires a confession be freely self-determined and the product of a rational intellect and a free will. <u>Robbins v. State</u> (1968), 250 Ind. 219, 235 N.E.2d 199. Even in the absence of coercion on the part of the interrogating officers, a confession may be involuntary where for example the accused's will, by reason of borderline feeblemindedness, was easily overborne by experienced interrogating officers. <u>Robbins</u>, <u>id.</u>

<u>Id.</u> at 1032.

In <u>Hurt v. State</u>, 694 N.E.2d 1212 (Ind. Ct. App. 1998), <u>trans. denied</u>, <u>cert. denied</u>, 525 U.S. 1008, 119 S. Ct. 525 (1998), William Hurt argued that the State failed to show that his waiver of <u>Miranda</u> rights and subsequent confession were voluntary. Hurt also argued that his waiver and confession were not the product of a rational intellect and free will because he was diagnosed as a schizophrenic, had been judicially determined to be mentally disabled upon being admitted to the hospital, and was required to ingest drugs

18

and told to confess as part of his treatment. 694 N.E.2d at 1217. The court concluded that the trial court properly found that Hurt's confession and waiver were voluntary under the circumstances. Id. at 1218. The court then addressed Hurt's argument that the State was required to show that his confession was voluntary under the Indiana Constitution and that such a showing requires a confession to be the product of a free will and rational intellect. Id. The court discussed Justice DeBruler's concurring opinion in Linthicum and held that, even applying the standard and burden of proof which Hurt proposes, the result does not change. Id.

The State cites Ajabu v. State, 693 N.E.2d 921 (Ind. 1998), for the proposition that the Indiana Supreme Court reaffirmed "the necessary prerequisite of police coercion or compulsion in for [sic] a defendant to establish that a confession was obtained in violation of Article 1, Section 14." Appellant's Reply Brief at 8. Specifically, the State cites the following portion from Ajabu:

> The decisional law as far back as 1860 has focused on the prerequisite of compulsion: "[The right] exempts no one from the consequences of a crime which he may have committed, but only from the necessity of himself producing the evidence to establish it." Wilkins v. Malone, 14 Ind. 153, 156 (1860). Stated concisely, our cases establish that there is a right not to be forced to speak, but there is no right to bar a confession freely given after appropriate warnings and waivers. See also Corder v. State, 467 N.E.2d 409, 415 (Ind. 1984) (defendant who spoke freely to court-appointed psychiatrists was not denied his rights under Section 14 or the Fifth Amendment); Ross v. State, 204 Ind. 281, 293, 182 N.E. 865, 869 (1932) ("The essence of the privilege is freedom from testimonial compulsion."); cf. State ex rel. Keller v. Criminal Court of Marion County, 262 Ind. 420, 428, 317 N.E.2d 433, 438 (1974) ("The Fifth Amendment is not a bar to any conviction resting on self-incrimination. It prohibits only compelled self-incrimination.").

693 N.E.2d at 930. The Court stated: "our cases establish that there is a right not to be forced to speak, but there is no right to bar a confession *freely given after appropriate warnings and waivers*." (Emphasis added). We also observe that the Court in Ajabu later quoted Justice Byron White's observations in his concurring opinion in Michigan v. Mosley, 423 U.S. 96, 108-109, 96 S. Ct. 321, 328-329 (1975), in which he stated: "There is little support in the law or in common sense for the proposition that an *informed* waiver of a right may be ineffective even where voluntarily made. . . . *Unless an individual is incompetent*, we have in the past rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case. To do so would be to imprison a man in his privileges. . . ." Id. at 933 (emphases added). We cannot say that Ajabu holds that coercive police activity is a necessary prerequisite to establish a violation of Article 1, Section 14 of the Indiana Constitution.

The evidence favoring the trial court's decision reveals that Banks had been diagnosed with schizo affective disorder which Dr. Maguire described as:

> A psychotic disorder that also has some mood systems, so it's kind of a combination of schizophrenia and bi-polar disorder. So there you have delusions, hallucinations, and then at the same time you can have periods where your mood is extremely euphoric and high and you're up for several days and then you can also have a period of depression.

Transcript at 11. The day after Detective Mitchell spoke with Banks, Dr. Maguire informed another detective that "it might be more productive to come after his medication had stabilized, because he had been out of it." Id. at 23. She testified that her opinion would have been the same the day before. She also testified that during the three-week period involving the interview by Detective Mitchell her opinion was that

20

Banks "had difficulty understanding anything that [she] talked to him about." Id. at 19. In a report dated days after the interview, Dr. Maguire stated that Banks had poor insight, judgment, and reasoning. At the hearing, Banks testified that he vaguely remembered the day when Detective Mitchell came to talk to him, and when asked whether he recalled Detective Mitchell advising him of his rights, Banks answered: "Not really, no." Id. at 56. He indicated that he did not really understand that he had certain rights that he could invoke so as to not give a statement and he "thought [Detective Mitchell] was telling [him] something totally different." Id. at 57. He said he did not know that he had the right to talk to a lawyer before he talked to Detective Mitchell, and that he interpreted the words "further questions" as Detective Mitchell "telling [him] like I would get a lawyer like right now like before he asked me questions." Id. When asked why he agreed to talk with Detective Mitchell, Banks replied: "I was in restraints. They had me restrained down. It's real vague. I was kind of like in and out of it." Id. at 58. He also indicated that had he been clearly advised, he would not have given up his rights and talked to Detective Mitchell.

As noted, the mere fact that a defendant is mentally ill does not render his statement inadmissible *per se*; instead, such is only one of the factors to be considered by the trier of fact, the trial court, in determining the voluntariness of a statement. Pruitt, 834 N.E.2d at 115. Here, the trial court considered the evidence presented of Banks's mental illness, heard Banks's own testimony and came to the conclusion that his statement was not voluntary, and under our standard of review, we are bound to give this determination deference.

21

We are therefore confronted with an inadequate <u>Miranda</u> warning to an undeniably and seriously mentally ill suspect who was in the area of the Newcastle Correctional Facility where the mentally ill are housed apart from the general prison population, who was involuntarily medicated at the time and in restraints even during the interrogation at issue. Yet, despite these compelling and compromising facts and circumstances, the State chose to interview Banks, and secured the confession we now review.

There is substantial evidence supporting the trial court's decision, and its decision is not contrary to law. Given our deferential standard of review, we affirm the trial court's determination that Banks's confession should be suppressed.

For the foregoing reasons, we affirm the court's grant of Banks's motion to suppress.

Affirmed.

NAJAM, J., and MATHIAS, J., concur.