

**FILED**

May 15 2019, 9:02 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Stacy R. Uliana<br>Bargersville, Indiana | Curtis T. Hill, Jr.<br>Attorney General of Indiana<br><br>Ian McLean<br>Supervising Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jesse L. Payne,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | May 15, 2019<br><br>Court of Appeals Case No.<br>18A-CR-1359<br><br>Appeal from the Parke Circuit Court<br><br>The Honorable Sam A. Swaim, Judge<br><br>Trial Court Cause No.<br>61C01-0505-FB-79 |

**Najam, Judge.**

## Statement of the Case

In *Barcroft v. State*, 111 N.E.3d 997, 1002-06 (Ind. 2018), the Indiana Supreme Court held that a fact-finder's conclusion that a criminal defendant was sane at the time of the commission of an offense could be supported by circumstantial

demeanor evidence[1] alone, even if the unanimous opinion of three court-appointed mental-health experts was that the defendant was suffering from a delusional psychosis at the time of the offense and that the circumstantial demeanor evidence was consistent with the defendant's delusions. In this appeal, Jesse L. Payne, a diagnosed schizophrenic who has suffered from delusions and hallucinations for a substantial part of his life, asserts that the State failed to present sufficient evidence to show that he was sane at the time he burned down two covered bridges in Parke County and attempted to burn down a third. In particular, he argues that the unanimous opinion of three court-appointed mental-health experts was that he was not sane at the time of the offenses and that the State's circumstantial demeanor evidence was not probative of his sanity because that evidence was consistent with Payne's delusions.

[2] Following *Barcroft*, we hold that the State's circumstantial demeanor evidence of Payne's behavior before, during, and after his offenses is sufficient to support the fact-finder's conclusion that Payne was sane at the time of those offenses, notwithstanding the unanimous opinion to the contrary by the three court-appointed mental-health experts, and Payne's arguments on appeal are merely requests for this Court to reweigh the evidence, which we cannot do. We also reject Payne's other arguments in this appeal. Accordingly, we affirm his

---

[1] Our Supreme Court defines "demeanor evidence" in such cases as "circumstantial evidence of a defendant's actions before, during, and after the crime to infer his or her mental state." *Barcroft*, 111 N.E.3d at 1004.

convictions for two counts of arson, one count of attempted arson, and for being an habitual offender, and we also affirm Payne's aggregate sentence of ninety years in the Department of Correction.

## Facts and Procedural History

[3] In 2002, the Jeffries Ford Covered Bridge in Parke County burned down. The first Parke County firefighters to arrive at the scene got there less than five minutes after the fire had been reported. When they arrived, however, the "entire bridge was on fire" and "the south span was already collapsed" into the creek below. Tr. Vol. 4 at 10. Subsequent investigation ruled out natural causes for the initiation of the fire and determined that "an ignitable liquid" had likely been used to burn down the bridge. *Id.* at 25.

[4] In April of 2005, Kristopher Bunting stayed at the Lighthouse Mission in Terre Haute for a time. During that time, Payne, who was out on parole, also stayed at the Lighthouse Mission. Around April 24, comments Payne made led Bunting to conclude that Payne "had a lot of hate," especially toward "Parke County." *Id.* at 38. Bunting also observed Payne reading numerous law-related books. Bunting was not comfortable being around Payne.

[5] At the Lighthouse Mission, Payne shared a room with David Nolan. In the evening hours of April 27, Payne asked Nolan "where the Mill Dam was," and Nolan told Payne that it was a little ways "up north" in Bridgeton. *Id.* at 48. Payne then "took off." *Id.* The Bridgeton Covered Bridge was "very close" to the mill dam. *Id.* at 11.

[6] That same evening, Jason Doddridge was working at a Jiffy Mini Mart in northwest Terre Haute. Shortly after Payne left the Lighthouse Mission, Doddridge observed Payne enter the Mini Mart and purchase one two-liter bottle of soda and prepay for one gallon of gasoline. Doddridge then observed Payne exit the store and "dump[] the soda from the bottle." *Id.* at 67. Doddridge also noted that Payne "did not pump a full gallon" of gasoline. *Id.* Not long thereafter, a little past midnight on April 28, Michael Long drove through Bridgeton and observed a red Honda parked near a vending machine just south of the Bridgeton Covered Bridge, which stood out to Long as "not typical for the town of Bridgeton." *Id.* at 71.

[7] At 12:42 a.m. on April 28, Parke County firefighters received a report that the Bridgeton Covered Bridge was on fire. The first firefighters to arrive at the bridge got there "less than a minute" after the fire had been reported, but the bridge was already "fully engulfed." *Id.* at 12. The Parke County Sheriff's Department then instructed "the full-time deputies . . . to check bridges" elsewhere in Parke County. *Id.* at 84.

[8] Meanwhile, in the early morning hours of April 28, Samantha Hill, an employee of the BP gas station in Groveland, observed Payne enter the store. Payne purchased one two-liter bottle of soda and "some gas." *Id.* at 80. Hill then observed Payne "[p]our[] . . . out" the two-liter bottle of soda and the put "gas in the two[-]liter" bottle. *Id.* at 81. Payne then left.

[9]   Around 1:40 a.m., Parke County Sheriff's Deputy Mike Watts went to Mansfield, which is between Bridgeton and Groveland, "to check the covered bridge there." *Id.* Deputy Watts observed Payne near the Mansfield Covered Bridge and asked Payne for his identification. Payne immediately responded that he "had a receipt to show where he had been." *Id.* at 85. Payne also volunteered that "he had a bottle of gasoline in his vehicle," a nearby red Honda. *Id.* at 86. Deputy Watts observed that Payne was not "nervous at all" and did not present himself in a manner that suggested to Deputy Watts that Payne may have suffered from mental illness. *Id.* at 94.

[10]   Parke County Sheriff's Deputy Eddie McHargue joined Deputy Watts shortly after Deputy Watts had arrived in Mansfield. Deputy McHargue "didn't see any problems with [Payne] at all" that suggested Payne may have suffered from mental illness. *Id.* at 117. Deputy McHargue read Payne his *Miranda* warnings and then inquired about Payne's recent routes of travel. Payne responded by saying that he had left Terre Haute to camp at Raccoon Lake and needed some gasoline for a campfire, and so Payne went to a nearby gas station, in Groveland, to get that gasoline, which he put in a two-liter bottle. Payne further responded that, after having obtained that gasoline, he decided not to camp at Raccoon Lake after all, that he wanted a soda, and that he knew there was a vending machine near the Mansfield Covered Bridge.

[11]   When asked why he did not get his gasoline at a more convenient gas station in Rockville given Payne's described route of travel, Payne said that he must not have seen any open gas stations in Rockville. When asked why he went out of

his way to go to Mansfield for a soda, Payne simply said "he knew there was a pop machine" there. *Id.* at 104. And when Deputy McHargue asked Payne how Payne had navigated around some construction on Payne's described route of travel, which construction did not in fact exist, Payne gave an explanation for navigating around the nonexistent construction.

[12] Deputy McHargue informed Payne that he did not think Payne was "being truthful," and he asked Payne if Payne would submit to a polygraph examination. *Id.* at 108. Payne agreed and the officers immediately escorted him to a nearby police station where Parke County Sheriff Charles L. Bollinger administered the test. Following that examination, Sheriff Bollinger concluded that Payne had exhibited a "strong likelihood of deception" and "untruthfulness." *Id.* at 154. Officers then detained Payne in the Parke County Jail on a parole hold. Less than one week later, Payne agreed to take an additional polygraph examination regarding the Jeffries Ford Covered Bridge fire in 2002. However, before that examination commenced, Payne admitted to having started that fire as well as having set fire to the Bridgeton Covered Bridge.

[13] The State charged Payne with arson of the Jeffries Ford Covered Bridge, arson of the Bridgeton Covered Bridge, attempted arson of the Mansfield Covered Bridge, and for being an habitual offender. At his ensuing jury trial, Payne asserted the defense of insanity. Dr. Ashan Mahmood, a court-appointed psychiatrist, reviewed Payne's lengthy medical history, the police reports of the incidents in question, and the probable cause affidavit. He also interviewed

Payne. Dr. Mahmood testified that "the records have been quite consistent in a long[-]term mental illness with a similar pattern of delusions, hallucinations, [and] non-adherence to medications[ and] requirement[s] of treatment." Tr. Vol. 5 at 74-75. Dr. Mahmood further testified that Payne's mental illness and symptoms have been "prevalent." *Id.* at 75. He then testified that he had diagnosed Payne with "schizophrenia" with "prominent delusions[ and] hallucinations," which illness had prohibited Payne from appreciating the wrongfulness of his arsons and attempted arson. *Id.* at 92.

[14] Dr. Jeffrey Huttinger, a court-appointed psychologist, similarly reviewed Payne's long medical history and Payne's "interact[ion] with the officers." *Id.* at 112. Dr. Huttinger also interviewed Payne. Like Dr. Mahmood, Dr. Huttinger testified that he had diagnosed Payne with "schizophrenia, paranoid type" at the time of the arsons and attempted arson, and Dr. Huttinger testified that Payne's illness prohibited Payne from appreciating the wrongfulness of his conduct at those times. *Id.* at 99-102. Dr. Huttinger further testified that Payne's demeanor near the time of the 2005 crimes—including "leaving suddenly from the Mission house . . . , purchasing gas[,] and . . . when he interacted with the police officers," and also including Payne having a "plan" for the crimes and an apparent cover story ready—would not be inconsistent with schizophrenia if those acts were "driven by some type of delusion." *Id.* at 112-18. As Dr. Huttinger explained, "sometimes schizophrenics . . . can make rational decisions even though they are . . . going through a . . . psychosis . . . . [T]hey can look like they are doing okay" but under proper questions and

examination a professional might discover that there are "more bizarre" thoughts at issue. *Id.* at 118.

[15] Payne and the State also jointly stipulated to the admission of a report by Dr. Rebecca Mueller, a court-appointed psychiatrist. Dr. Mueller reviewed the charging information, the probable cause affidavit, and Payne's medical history. She also interviewed Payne. According to Dr. Mueller's report, at the time of the offenses Payne suffered from schizophrenia; he "had extended periods of time where he experienced auditory and/or visual hallucinations[] and delusions"; he was "insane at the time of the alleged offenses"; and he "was unable to appreciate the wrongfulness of his conduct at the time of the alleged offenses." Ex. Vol. 7 at 125-26 (emphases removed).[2] No other experts testified or provided other evidence for or against Payne's insanity defense.

[16] The jury rejected Payne's insanity defense and instead found Payne guilty but mentally ill[3] for the arson of the Jeffries Ford Covered Bridge, the arson of the Bridgeton Covered Bridge, and the attempted arson of the Mansfield Covered

---

[2] Our pagination of the Exhibits Volume is based on the .pdf pagination, and the parties' refusal to do the same and instead merely cite a given exhibit's labeled number has hindered our review.

[3] As our Supreme Court has explained:

> A verdict of guilty but mentally ill requires an evaluation and treatment of the defendant's mental illness during his or her incarceration "in such a manner as is psychiatrically indicated," but otherwise imposes the same criminal sentence as a standard conviction of guilt. Ind. Code § 35-36-2-5(a), (c). By contrast, a verdict of nonresponsibility by reason of insanity may result in the defendant's civil commitment if the trial court finds by clear and convincing evidence that the defendant is mentally ill and either dangerous or gravely disabled. I.C. § 35-36-2-4.

*Barcroft*, 111 N.E.3d at 1001 n.2.

Bridge. The jury also found Payne to be an habitual offender. The trial court entered its judgment of conviction accordingly, and, following a separate hearing, the court sentenced Payne to an aggregate term of ninety years in the Department of Correction. This appeal ensued.

# Discussion and Decision

## Issue One: Insanity Defense

[17] On appeal, Payne first asserts that the State failed to present sufficient evidence to rebut the evidence favorable to his defense of insanity. As our Supreme Court made clear in *Barcroft*:

> A factfinder's determination that a defendant was not insane at the time of the offense warrants substantial deference from an appellate court. On review, we do not reweigh evidence, reassess witness credibility, or disturb the factfinder's reasonable inferences. We will instead affirm the [defendant's] conviction unless the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed.

111 N.E.3d at 1002 (citations and quotation marks omitted). Further:

> To convict a criminal defendant, the State must prove each element of the offense beyond a reasonable doubt. But a defendant may avoid criminal responsibility by invoking the insanity defense. This plea requires the defendant to prove by a preponderance of the evidence (1) that [he] suffers from a "mental disease or defect" and (2) that the "mental disease or defect" rendered [him] unable to appreciate the wrongfulness of [his] conduct at the time of the offense.

*Id.* (citations and footnote omitted).

[18]  In *Barcroft*, the defendant shot and killed her pastor. At her ensuing murder trial, two court-appointed mental-health experts concluded that, at the time of the offense, the defendant suffered from schizophrenia. A third court-appointed mental-health expert concluded that, at the time of the offense, she suffered from delusional disorder. But the three experts agreed that the defendant's mental illness caused her to experience delusions that prevented her from appreciating the wrongfulness of her conduct. They also each testified that the defendant's demeanor evidence before, during, and after the shooting was consistent with her delusional psychosis and supportive of their respective diagnoses. Nonetheless, the trial court rejected the defendant's insanity defense and instead found her guilty but mentally ill.

[19]  Our Supreme Court affirmed the trial court's judgment and held that the State's "demeanor evidence [was] more than sufficient to support the [fact-finder's] rejection of [the defendant's] insanity defense" notwithstanding the unanimous opinion of the three court-appointed mental-health experts. *Id.* at 1006. The court explained:

> First, [the defendant] exhibited deliberate, premeditated conduct in the weeks and days leading up to the crime: She asked another member of the church when [the pastor] planned to return from a mission trip. She purchased a handgun and waited for a permit. She prepared goodbye letters to members of her family. She packed several rounds of ammunition, a pair of binoculars, and other personal items in her backpack. And she planned to confront the pastor during the early morning hours,

before the day's activities had started and to avoid potential witnesses. [The defendant's] choice of clothing—black pants and a black, hooded sweatshirt—likewise show a calculated attempt to evade detection or to obscure her identity.

[The defendant's] actions during and right after the shooting also suggest a consciousness of guilt. As she spoke with [another church member] outside the church, she kept her handgun—a .22 caliber pistol—concealed in her front pocket. Even more revealing was her decision to spare [that church member's] life. Expert testimony suggested that this conduct reflected [the defendant's] delusional state, the inference being that a sane person would have shot the eyewitness to avoid criminal implication. But a factfinder could have reasonably come to the opposite conclusion: that [the defendant's] decision not to shoot showed an understanding that killing is wrong.

Cloaked by the hood of her sweatshirt, [the defendant] then fled from the crime scene and attempted to hide, taking great pains to conceal herself under the foliage of an overgrown lot. She lay motionless in her hiding spot even as police ordered her to surrender, emerging only when an officer threatened to shoot.

Finally, when the detective asked whether [the defendant] understood that she "ha[d] to be arrested" for her crime, she replied that she had "actually planned on not getting caught." This comment implies a consciousness of guilt. . . .

*Id.* at 1005-06 (last alteration in original; citations, quotation marks, and footnote omitted).

[20] In other words, the State's demeanor evidence in *Barcroft* showed "deliberate, premediated conduct . . . leading up to the crime"; a "calculated attempt to

evade" after the crime; and "actions during and right after the [crime]" that suggested "consciousness of guilt." *Id.* at 1005. Although the unanimous opinion of the mental-health experts in *Barcroft* was that the defendant was "legally insane at the time of the offense and could not appreciate the wrongfulness of her actions" due to a complex delusional psychosis, and although the experts agreed that the defendant's demeanor evidence was consistent with her delusions, our Supreme Court held that it was within the fact-finder's prerogative to consider that demeanor evidence for itself and to reject the mental-health experts' unanimous opinion. *Id.* at 1002-06.

[21] Following *Barcroft* here, we are obliged to conclude that the State's demeanor evidence of Payne's behavior before, during, and after the offenses is sufficient to support the jury's finding that Payne was sane at the time of those offenses. That evidence suggests that Payne's conduct surrounding the crimes was calculated, deliberate, and premeditated. He concealed his involvement in the Jeffries Ford Covered Bridge fire for about three years. The evening before the Bridgeton Covered Bridge fire, he asked where the mill dam was; he purchased one two-liter bottle of soda along with one gallon of gasoline, and then he poured out the soda and filled the bottle with gasoline; after having burned down the Bridgeton Covered Bridge, he drove out of his way to Groveland to again obtain gasoline and a two-liter bottle along with a paper receipt that would support an attempted alibi defense; in both Bridgeton and Mansfield he parked near vending machines in case someone engaged him, again in apparent

support of an attempted alibi; and he committed his acts late at night when the opportunity for witnesses would be diminished.

[22] Payne's actions during and right after the fires also suggest consciousness of guilt. Again, he concealed his involvement in the Jeffries Ford Covered Bridge fire for about three years. Further, in between the Bridgeton Covered Bridge fire and the attempted arson of the Mansfield Covered Bridge, Payne drove to the BP gas station in Groveland to obtain a time-stamped receipt as part of his attempted cover story; when asked for his identification by Deputy Watts in Mansfield, Payne immediately responded that he "had a receipt to show where he had been," Tr. Vol. 4 at 85; and when officers asked him about his route of travel from Terre Haute to Mansfield by way of, supposedly, Rockville, Payne lied to the officers about navigating through nonexistent construction.

[23] Payne's arguments on appeal are, in essence, the same arguments our Supreme Court rejected in *Barcroft*. Specifically, Payne asserts that the jury could not reasonably infer sanity from the evidence because the expert witnesses unanimously concluded that he was not sane at the time of the offenses; the lay witnesses' testimony—e.g., Bunting's testimony and Nolan's testimony—is not inconsistent with the expert testimony; ample evidence supports the experts' diagnoses of Payne; and the demeanor evidence was not inconsistent with the unanimous opinion of the court-appointed mental-health experts that Payne was suffering from a delusional psychosis at the time of the offenses. However, we conclude, following *Barcroft*, that Payne's arguments are merely requests for

this Court to reweigh the evidence on appeal, which we cannot do. 111 N.E.3d at 1002.

[24] In sum, in *Barcroft* our Supreme Court clarified that Indiana's appellate courts are to review a fact-finder's rejection of a claim of insanity the same way we review any other claim of insufficient evidence to support a fact-finder's determinations. We review only the evidence most favorable to the fact-finder's judgment, and we do not "reweigh evidence, reassess witness credibility, or disturb the factfinder's reasonable inferences." *Id.* Applying that standard here, we are obliged to conclude that the State presented sufficient evidence to show that Payne was able to appreciate the wrongfulness of his conduct at the time of the offenses and, thus, that he was legally sane at those times.

### Issue Two: Admission of Statements to Officers, Polygraph, and Confession

[25] Payne next asserts that the trial court abused its discretion when it admitted into evidence Payne's statements to the officers in Mansfield, a video-recording of Payne's polygraph examination with Sheriff Bollinger, and Payne's confession to Sheriff Bollinger less than one week after the polygraph examination.[4] As our Supreme Court has stated:

---

[4] We agree with the State's assessment that Payne does not provide a separate and independent analysis of his rights under the Indiana Constitution, at least insofar as such an analysis relates to the only issue properly preserved for appellate review, and thus any arguments under the Indiana Constitution are waived. *Myers v. State*, 839 N.E.2d 1154, 1158 (Ind. 2005).

> Generally, a trial court's ruling on the admission of evidence is accorded "a great deal of deference" on appeal. *Tynes v. State*, 650 N.E.2d 685, 687 (Ind. 1995). "Because the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion" and only reverse "if a ruling is 'clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.'" *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014) (quoting *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013)).

*Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015).

[26] We initially note that Payne makes numerous arguments on appeal relating to the purported inadmissibility of his statements, the polygraph, and his confession. However, in the trial court, Payne objected to the admissibility of that evidence only on the ground that he "did not make a knowing and voluntary waiver of his right[s] . . . in light of [his] diminished capacity as a result of his mental illness . . . ." Tr. Vol. 4 at 99-100, 138-40.[5] A party may not object to the admissibility of evidence in the trial court on one ground and then assert on appeal that that evidence was inadmissible on different grounds. *Hitch v. State*, 51 N.E.3d 216, 219 (Ind. 2016). Accordingly, we limit our review on appeal to Payne's argument that his mental illness, standing alone, renders his

---

[5] Payne further asserted in the trial court that *Indiana v. Edwards*, 554 U.S. 164 (2008), should apply to the admissibility of the evidence at issue, but Payne does not raise that question for our review on appeal. *See* Ind. Appellate Rule 46(A)(8)(a). We also note that, in a prior interlocutory appeal, we affirmed the trial court's denial of Payne's motion to suppress the evidence on other grounds. *Payne v. State*, 854 N.E.2d 1199, 1202-05 (Ind. Ct. App. 2006), *trans. denied*.

statements, polygraph examination, and confession inadmissible.[6]  And we reject that argument.

[27]  As we have explained:

> The trial court's decision regarding admissibility of a confession or incriminating statement is controlled by determining from the totality of the circumstances whether the statement was given voluntarily[] rather than through coercion or other improper influence so as to overcome the free will of the accused. Standard indicators for voluntariness include whether the confession was freely self-determined, the product of a rational intellect and free will, without compulsion or inducement of any sort, and whether the accused's will was overborne. *"The mere fact a statement is made by the defendant while under the influence of drugs, or that the defendant is mentally ill, does not render it inadmissible per se." Pruitt[ v. State]*, 834 N.E.2d [90,] 115 [(Ind. 2005)] (citing *Brewer v. State*, 646 N.E.2d 1382, 1385 (Ind. 1995)). *"Intoxication, drug use and mental illness are only factors to be considered by the trier of fact in determining whether a statement was voluntary." Id.*  The State also bears the burden of proving beyond a reasonable doubt that the defendant's confession was voluntarily given.

---

[6] Arguments not preserved for our review on this issue include Payne's argument that the stipulation he signed prior to the administration of the polygraph examination did not sufficiently advise him of his rights and was unlawfully ambiguous; that he was not properly Mirandized prior to his May confession; and that his confession resulted from "flagrant" misconduct by Parke County law enforcement officers in "exploit[ing] an obviously delusional man." Appellant's Br. at 34. Payne similarly has not preserved for our review his assertions that his statements to officers were not lawfully given because of "coercive tactics" allegedly utilized by Parke County law enforcement officers against Payne. *Id.* at 36. And Payne does not argue fundamental error on appeal. *See Curtis v. State*, 948 N.E.2d 1143, 1148 (Ind. 2011).

*State v. Banks*, 2 N.E.3d 71, 80-81 (Ind. Ct. App. 2014) (emphasis added; some citations omitted), *trans. denied*.

[28] Thus, our case law is clear that one's mental illness "does not render" statements to officers "inadmissible per se." *Id.* at 81. Payne's argument to the contrary on appeal is not consistent with Indiana precedent, and, as such, he has not met his burden on appeal to show that the trial court abused its discretion when it rejected that argument. Accordingly, we affirm the trial court's judgment on this issue.

### Issue Three: Venue

[29] We next consider Payne's argument on appeal that the trial court abused its discretion when it declined Payne's request to transfer venue out of Parke County. In particular, Payne asserts that the trial court erred because the entire population of Parke County was the victim of his acts. According to Payne, the implied bias of every possible juror in Parke County was summarized in pretrial statements made by the Parke County Prosecutor: Payne's acts were a "direct attack on Parke County's Heritage." Appellant's App. Vol. II at 65. In other words, Payne asserts that he was entitled to a transfer of venue because it was impossible for him to receive a fair trial in Parke County.

[30] As our Supreme Court has explained:

> in order to obtain a change of venue [the defendant] bears the
> burden of showing that community prejudice exists which would
> prevent his obtaining a fair trial in that community, and to
> prevail on appeal from the denial of his motion he must

demonstrate an abuse of the trial court's discretion. . . . [T]o establish such an abuse of discretion, [the defendant] must demonstrate both prejudicial pretrial publicity and juror inability to render an impartial verdict on the evidence.

*Clemons v. State*, 610 N.E.2d 236, 240 (Ind. 1993).

[31] Among other deficiencies in his argument on this issue on appeal, Payne has not shown that any of the seated jurors were unable to set aside any preconceived notions of guilt and decide the case on the evidence. *See id.* Payne cites no portion of the *voir dire* that reveals partiality on the part of any jurors who heard his trial. *See id.* And we reject Payne's speculation that all of the potential jurors were necessarily impliedly biased against anyone accused of these offenses. We therefore affirm the trial court's denial of Payne's motion to transfer venue.

### Issue Four: Episode of Criminal Conduct

[32] We next consider Payne's argument that the trial court erred when it did not find the arson of the Bridgeton Covered Bridge and the attempted arson of the Mansfield Covered Bridge to be an episode of criminal conduct. "Separate offenses are not part of a single 'episode of criminal conduct' when a full account of each crime can be given without referring to the other offenses." *Reeves v. State*, 953 N.E.2d 665, 671 (Ind. Ct. App. 2011), *trans. denied*. "[W]hether a series of crimes are related in some way is not the relevant test." *Id.*

[33] Here, Payne's assertions aside, the facts plainly demonstrate that Payne prepared for and completed the act of arson of the Bridgeton Covered Bridge. Thereafter, he drove to Groveland, obtained additional gasoline, and then drove to Mansfield in an attempt to burn down the Mansfield Covered Bridge. A full account of the Bridgeton Covered Bridge arson is readily given without reference to the attempted arson of the Mansfield Covered Bridge and vice versa. These were each independent crimes. The trial court did not error when it declined to find Payne's two crimes to be an episode of criminal conduct.

### Issue Five: Inappropriateness of Sentence

[34] Finally, we address Payne's argument that his aggregate term of ninety years in the Department of Correction is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." "The principal role of appellate review should be to attempt to leaven the outliers," not to "achieve a perceived 'correct' result in each case. Defendant has the burden to persuade us that the sentence imposed by the trial court is inappropriate." *Shoun v. State*, 67 N.E.3d 635, 642 (Ind. 2017) (citations and omission removed).

[35] Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind.

2008). "The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed." *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017), *trans. denied*. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224. Deference to the trial court "prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[36] The trial court entered judgment on each of Payne's convictions for arson and attempted arson as a Class B felony, which, at all relevant times, carried a sentencing range of six to twenty years and an advisory sentence of ten years. *See* Ind. Code § 35-50-2-5 (2005). Following the jury's finding, the trial court also entered judgment against Payne as an habitual offender, which carried an additional mandatory term of ten to thirty years. *See* I.C. § 35-50-2-8 (2005). Thus, Payne faced a maximum aggregate term of ninety years, which is the sentence the court imposed.

[37] In imposing that sentence, the trial court stated as follows:

> the Court finds the following aggravating circumstances: The harm, injury[,] or loss associated with the offense[s] was greater than the elements necessary to prove the commission of the

offense[s], and the loss was significant in that the structures targeted and destroyed had historical significance. The defendant has a history of delinquent or criminal activity . . . . The defendant was recently released from prison and on parole at the time of the offense[s]. The defendant's character indicates that he has a compulsion to commit crimes and if released would likely commit further crimes, particularly Arson. Court considers the following mitigating circumstances: The defendant suffers from mental illness, particularly paranoid schizophrenia. However, the defendant has a history of non-compliance with treatment, lack of a support system, and the Court finds that he can receive rehabilitative, structured supervision and treatment in the Indiana Department of Correction.

Appellant's App. Vol. VI at 213.

[38] On appeal, Payne asserts that the nature of the offenses "does not justify a maximum sentence" but instead simply shows "that a sick man burned two bridges when no one was around or could get hurt, and intended to burn a third." Appellant's Br. at 45. He further asserts that his character justifies a downward revision of his sentence because "a person who is so mentally ill to be found Guilty But Mentally Ill is not one of the worst of the worst offenders." *Id.* at 43.

[39] But we cannot say that Payne's sentence is such an outlier that our disruption of the trial court's sentencing discretion is required. Although we agree with Payne that his mental illness is well documented and significant, the Department of Correction is not devoid of authority to address the needs of mentally ill prisoners. *See* Ind. Code §§ 11-10-4-1 to -9 (2018). Moreover, the nature of the offenses here was significant: Payne destroyed two historically

significant bridges and would have destroyed a third but for the intervention of local law enforcement officers. We also reject Payne's assumption that the arsons here did not put any people at risk when each arson required an emergency response by local firefighters.

[40] Neither does Payne's character justify this Court's revision of his sentence. Payne has a lengthy criminal history, including five juvenile delinquency adjudications and three adult felony convictions, one of which was for arson. He has a prior probation revocation, and he was on parole at the time he committed the Bridgeton Covered Bridge arson and attempted to commit the arson of the Mansfield Covered Bridge. Accordingly, we cannot say that Payne's aggregate sentence of ninety years in the Department of Correction is inappropriate in light of the nature of the offenses and his character.

## Conclusion

[41] In sum, we affirm Payne's convictions and his sentence.

[42] Affirmed.

Baker, J., and Robb, J., concur.