Vaughn REEVES, Sr., Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 77A01–1012–CR–646.

Court of Appeals of Indiana.

Sept. 19, 2011.

Transfer Denied Dec. 1, 2011.

666

John Pinnow, Special Assistant to the State Public Defender, Greenwood, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BRADFORD, Judge.

Appellant–Defendant Vaughn Reeves, Sr., appeals from his convictions of and sentences for nine counts of Class C felony Aiding, Inducing, or Causing Securities Fraud.[1] Reeves contends that the trial court abused its discretion in admitting certain evidence and in sentencing him and that his aggregate sentence is inappropriately harsh. We affirm.

## FACTS AND PROCEDURAL HISTORY

Reeves started Alanar, a company specializing in church bonds, and moved it to Sullivan, Indiana in 1989. Over time, Reeves's three sons joined Alanar, which at one point had twenty to twenty-five licensed brokers in its employ. Church bonds are issued by churches to investors, with the money raised generally going toward construction or expansion projects. Bond-issuing churches work with a broker, such as Alanar, to facilitate the bond issue. After the broker generates and sells the bond, the money generated by the sales is deposited into a proceeds account, from which the church draws funding for its project. Over time, the church pays money into a repayment account, which is supposed to be held in trust and from which principal and interest payments to the bondholders are drawn. A paying agent is also involved in the process, and "is the company that makes sure that the payments go to the right place." Tr. p. 215.

Alanar was located in a building near courthouse square in Sullivan. The building also housed Liberty Group, Guardian Services, AIC Aviation, Churchmen's Capital Group, and Churchmen's Investment Corporation. Liberty and Guardian were paying agents. Collectively, the building housed eleven Alanar-related entities, all of which were controlled by Reeves and shared a receptionist.

At some point, Joe Craft began working at Alanar and was eventually promoted to president of Liberty Group, Guardian Services, and First Financial Services, which

---

1. Ind.Code §§ 23–2–1–12 (2008); 35–41–2–4 (2008).

were paying agents servicing proceeds and repayment accounts for Alanar. Craft introduced his friend Jeff Beattie to Chip Reeves, one of Reeves's sons. Beattie had a hobby trading stock options using E*trade, an online clearing house for stocks, bonds, options, and futures, and had developed a "system" for making money. Tr. p. 634. Beattie started at Alanar in 2002 or 2003, and his sole responsibility was to "sit at a computer and make trades with the Churchmen's Capital money[.]" Tr. p. 658. Chip instructed Beattie to have little interaction with other employees and to "pretty much just stay in [his] office, keep the door shut, you know, keep busy." Tr. p. 659.

Over the years, Alanar issued bonds for several churches, including the bonds at issue in this case. For Life Worship and Training Center ("Life Worship"), Alanar issued bonds 9939 and 2018; for Living Word Missions, Inc. ("Living Word"), bonds 9702 and 9934; for Iglesia del Nazareno el Buen Samaritano, Inc., and Iglesia Christiana el Buen Samaritano, Inc. ("Iglesia"), bonds 9609, 9703, and 2204; for St. Paul Community Center Limited Partnership ("St. Paul"), bond 9930; and for Church of Christ Griffin Road, Inc. ("Griffin Road"), bonds 2309 and 2316. A forensic review of the four or five different accounting systems used by Alanar uncovered "hundreds of thousands" of transactions and "money flowing in and out of different companies and different bond issue accounts." Tr. p. 432. Many of these transactions were "inappropriate." Tr. p. 452, 465, 469, 479; State's Exs. 74–78.

The following table summarizes improper payments into and from repayment or proceeds accounts of bonds issued by the five churches in this case:

| Church | Bonds | Payments from Church or Proceeds From Bond Sales | Payments to Bondholders or Transfers to Church | Improper Payments Into Account | Improper Payments From Account |
|---|---|---|---|---|---|
| Life Worship | 9939, 2018 | $ 3,731,991 | $ 2,468,124 | $ 1,821,500 | $ 3,221,900 |
| Living Word | 9702, 9934 | $ 4,093,003 | $ 2,702,965 | $ 1,477,334 | $ 2,537,827 |
| Iglesia | 9609, 9703, 2204 | $ 5,514,144 | $ 3,800,568 | $ 2,166,529 | $ 4,065,419 |
| St. Paul | 9930 | $ 6,439,500 | $ 1,397,021 | $ 1,728,960 | $ 3,451,958 |
| Griffin Road | 2309, 2316 | $ 1,582,500 | $0 | $0 | $ 1,507,500 |
| | Totals | $21,361,138 | $10,368,678 | $7,194,053 | $14,784,604 |

The bulk of the improperly-transferred money was sent to or received from Churchmen's Capital and Churchmen's Investment's E*Trade account. According to forensic accountant Erika Gowen, it appeared as though money was being transferred into accounts so that bondholders could be paid when interest payments became due. Other times, money would be transferred into proceeds accounts when a church needed a construction draw.

When churches defaulted on bond payments, Reeves would try to find money in some other bond issue's account in order to cover the defaulting church, essentially taking from Peter to pay Paul. Gowen detected a pattern in Alanar's behavior where it would attempt to attract additional investors in order to raise money to pay existing bondholders when a church defaulted on its bond repayment obligations. Although the transfers had some characteristics of a classic "Ponzi" scheme, one

distinction was that the church bonds actually existed. In Gowen's view, it was omission of a material fact not to disclose to potential investors in a bond prospectus that the bondholders' money might be transferred to another entity, which was not done here.

In the end, the accounts in question were "raided" until the middle of 2005, after which the Securities Exchange Commission ceased Alanar's operations on April 26, 2005. Tr. p. 512. All told, 395 persons bought Life Worship bonds, 963 bought Living Word bonds, 802 bought Iglesia bonds, 887 bought the St. Paul bond, and 140 bought Griffin Road bonds. Gowen estimated the total loss to Life Worship investors to be $1,346,000; Living Word, $4,321,000; Iglesia, $2,200,000; St. Paul, $5,649,000; and Griffin Road, $1,456,000.

On June 30, 2009, the State charged Reeves with ten counts of Class C felony inducing, aiding, or causing securities fraud. On August 28, 2009, Reeves filed a motion to dismiss all counts, on the ground, *inter alia,* that the prosecution had not commenced within five years of the commission of the alleged offenses. On September 27, 2010, the trial court denied Reeves's motion to dismiss. On October 21, 2010, a jury found Reeves guilty of all charges save Count 9, which had involved alleged malfeasance related to bond 9934, issued by Living Word.

On December 7, 2010, the trial court sentenced Reeves to six years of incarceration for each conviction, all sentences to be served consecutively. The trial court found, as aggravating circumstances, that Reeves's crimes had 2904 victims; those victims lost $13,149,000 as of sentencing; the harm, injury, loss, or damages was greater than necessary to prove the crimes; Reeves generally targeted elderly victims at least sixty-five years old; and Reeves used religion and faith to entice his victims. The trial court found, as mitigating circumstances, Reeves's lack of a history of delinquent or criminal behavior, his expressed remorse, his cooperation with law enforcement, and the hardship his imprisonment would work on his wife.

## DISCUSSION

### I. Whether the Trial Court Abused its Discretion in Admitting Certain Evidence

The State charged Reeves on June 30, 2009, with ten Class C felonies, meaning that, in the absence of concealment, he could not have been convicted as charged unless the offenses had occurred within five years of that date. *See* Ind.Code § 35–41–4–2 (2008) ("Except as otherwise provided in this section, a prosecution for an offense is barred unless it is commenced ... within five (5) years after the commission of the offense, in the case of a Class B, Class C, or Class D felony[.]"). Reeves concedes that for all nine counts for which he was convicted, the State produced evidence of transactions that fell within the statutory period, *i.e.,* after June 30, 2004. Reeves argues, however, that the admission of evidence of any transactions that occurred before June 30, 2004, was erroneous and not harmless.[2]

The basis argued by the State below and accepted by the trial court for its admissibility was that Reeves had concealed evidence of his offenses, thereby tolling the running of the statute of limitation. *See* Ind.Code § 35–41–4–2(h)

---

**2.** Reeves framed this argument as a challenge to the trial court's denial of his pretrial motion to dismiss. At its heart, however, Reeves's argument is that he was prejudiced by the admission of allegedly inadmissible evidence at trial.

("The period within which a prosecution must be commenced does not include any period in which ... the accused person conceals evidence of the offense, and evidence sufficient to charge the person with that offense is unknown to the prosecuting authority and could not have been discovered by that authority by exercise of due diligence[.]"). The State, however, failed to allege concealment in its charging information, rendering this basis for admissibility of the previous transactions improper. *See Reeves v. State,* 938 N.E.2d 10, 17(Ind.Ct.App.2010) (in prosecution of one of Reeves's sons based on the same transactions, concluding that State could not rely on concealment to toll statute of limitation where it failed to allege facts sufficient to show concealment in charging information), *trans. denied.* We conclude, however, that evidence of transactions that occurred before June 30, 2004, was admissible on another ground. It is well-settled that "[t]he Court of Appeals may affirm the trial court's ruling [on the admissibility of evidence] if it is sustainable on any legal basis in the record, even though it was not the reason enunciated by the trial court." *Scott v. State,* 883 N.E.2d 147, 152 (Ind.Ct.App. 2008).

◼ As a general rule, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" Ind. Evidence Rule 404(b). "To be admissible according to any one of these exceptions, however, the evidence must possess substantial probative value." *Malone v. State,* 441 N.E.2d 1339, 1346 (Ind.1982) "The test for admission is whether or not the evidence is so specifically and signifi-

cantly related to the charged crime in time, place and circumstance as to be logically relevant to one of the particular excepted purposes." *Id.* "Extrinsic evidence may properly be admitted under Evid. R. 404(b) as per the common scheme or plan exception if it is admitted to either: (1) prove the identity of the perpetrator by showing that the defendant has committed other crimes with an identical modus operandi; or (2) as 'evidence of a preconceived plan which included the charged crime.'" *Moore v. State,* 653 N.E.2d 1010, 1015–16 (Ind.Ct.App.1995) (quoting *Hardin v. State,* 611 N.E.2d 123, 129 (Ind.1993)), *trans. denied.*

◼ Reeves's identity was not at issue, so if evidence of other transactions were to be admissible under the common scheme or plan exception, it would be because it tended to show that the transactions were part of a preconceived plan.

In order for evidence of previous crimes to be introduced for purposes of showing that an accused possessed the requisite intent to commit the instant crime, he must specifically place his intent at issue: "The intent exception in Evid. R. 404(b) will be available when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent." *Wickizer v. State* (1993) Ind., 626 N.E.2d 795, 799. That an accused presents a defense which denies commission of an act in its entirety will not suffice; in order that intent is affirmatively presented as an issue, an accused must in effect admit to the commission of the act, but profess that he acted with some intent contrary to that required by the statute under which he is charged. *See Fisher v. State* (1994) 2d Dist.Ind. App., 641 N.E.2d 105, 108. *Id.* at 1017.

◼ Here, Reeves testified at trial, specifically admitting that he either directed

or was aware of all of the transactions at issue here while claiming that he believed them to be appropriate. Because Reeves placed his intent at issue, evidence involving transactions outside the statutory period was therefore rendered admissible to prove his criminal intent with regard to transactions within the statutory period.

Moreover, evidence of earlier transactions is clearly related to the charged conduct in time, place, and circumstance as to have substantial probative value regarding Reeves's intent. Given the number of transactions, and their interrelated nature, it is difficult to see how one could grasp the significance of later transactions without the context of the earlier ones. For example, Reeves observes that for St. Paul bond 9930, transactions after July 1, 2004, actually resulted in a net gain to the bond's accounts. Far from helping Reeves, however, this only underscores the merit of admitting evidence of prior improper withdrawals to provide proper context.

■ As we have held, "[e]vidence of uncharged criminal activity is admissible to complete the story of a criminal transaction." *Miller v. State*, 593 N.E.2d 1247, 1253 (Ind.Ct.App.1992). According to the theory advanced by the State at trial, the later deposits, which might have seemed innocent in isolation, would not have been necessary had there not been improper withdrawals in the past. Preventing the State from presenting evidence regarding those earlier transactions would result in giving the jury an incomplete or misleading impression regarding the totality of the circumstances. The State was therefore entitled to "introduce evidence to demonstrate [a] common plan or scheme of criminal activity [that] precipitat[ed] the offense[s] now being tried." *Clarkson v. State*, 486 N.E.2d 501, 506 (Ind.1985). We conclude that for all nine counts for which

Reeves was convicted, evidence of transactions prior to June 30, 2004, was admissible under the common scheme or plan exception to Rule 404(b), and so affirm the trial court's decision to admit it, even though not made on that basis. *See, e.g., Miller v. State*, 593 N.E.2d 1247, 1252–53 (Ind.Ct.App.1992) (in case involving sale of unregistered stock in company that purportedly was going to produce and sell space on advertising boards, concluding that evidence of sales of boards for which defendant was charged with no crime was nonetheless admissible to show that sales were part of overall scheme to defraud investors), *trans. denied.*

## II. Whether the Trial Court Abused its Discretion in Sentencing Reeves

Reeves contends that the trial court abused its discretion in imposing consecutive sentences, arguing that it was prevented from doing so because securities fraud is not a crime of violence under Indiana Code section 35–50–1–2 and because all of his convictions arose from a single episode of criminal conduct. If Reeves is correct, the maximum aggregate sentence he could have received was ten years of incarceration. *See* Ind.Code § 35–50–1–2(c)(2) (2008).

■ Reeves argues that because all of his crimes were all part of the same modified Ponzi scheme, they were all part of a single episode of criminal conduct. Be that as it may, whether a series of crimes are related in some way is not the relevant test. Separate offenses are not part of a single "episode of criminal conduct" when a full account of each crime can be given without referring to the other offenses. *Tedlock v. State*, 656 N.E.2d 273, 276 (Ind. Ct.App.1995). Although Reeves's crimes may have been similar and interrelated in some ways, Reeves does not claim, much

less establish, that any difficulty would be presented in giving a full account of each of the nine crimes without referring to the other eight. Each count involved a different bond that was not issued with any of the other bonds, different sets of transactions, and different groups of victims. Because Reeves's crimes were not part of a single episode of criminal conduct, Reeves has failed to establish that the trial court abused its discretion in imposing consecutive sentences. *See, e.g., id.* (concluding that four instances of securities fraud committed against four different victims at different times were not part of a single episode of criminal conduct simply because all four sales involved same kind of security).

### III. Whether Reeves's Sentence is Appropriate

■ We "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Shouse v. State*, 849 N.E.2d 650, 660 (Ind.Ct.App.2006) (citations and quotation marks omitted), *trans. denied.*

■ Although Reeves's crimes were property crimes, they were not ordinary property crimes, resulting in staggering losses to thousands of victims: $13,149,000 lost by 2904 victims, at least some of whom had their retirement savings wiped out. Among the victims was Steven Duncan, who lost $600,000, money that was intended to fund his retirement. Duncan testified that the loss ruined his marriage and his life and that his current blindness might have been avoided had he been able to afford medical insurance. Reverend Roger Wright, who had invested his entire retirement savings in Alanar, lost it all, a total of $179,152. Rev. Wright, like many ministers, had not paid into the Social Security system and so was completely dependent on his retirement income, which is now gone. Indeed, a large percentage of Reeves's victims were elderly, a group he targeted.

Moreover, the trial court found, and the record indicates, that Reeves exploited the religion and faith of his victims. After the terms of a bond issue were finalized, Alanar would organize a "kickoff" night at the church in order to start selling bonds. Alanar's sales presentations at the kickoffs included reminding potential bondholders of their "Christian responsibility" to support the church by buying bonds. Appellant's App. p. 42. Alanar also encouraged the use of a team of church members to sell bonds to other members following the kickoffs and provided training materials to that end. The training materials promoted the use of several tactics, including opening the sales call with a prayer, quoting scripture, and advising the church member who was attempting to sell to others to "buy a bond to set an example." Appellant's App. p. 42. Many of Reeves's victims trusted him because they believed him to be a Christian and considered the fact that they were investing with a Christian company when deciding whether to invest. In light of the very large number of victims, the vast amount of their losses, and the elements of cynical exploitation to Reeves's scheme, we consider his crimes to be very egregious.

While Reeves's lack of a prior criminal history and expressions of remorse do him some credit, it certainly should be noted

that evidence presented at trial does not. Reeves testified that he felt there was nothing wrong with what he was doing at Alanar. Two Alanar employees, however, testified that they faced retribution when they began to understand the true workings of Alanar. When broker Adam Holden began receiving complaints from holders of a certain church bond that they were not receiving their payments, he called the church to inquire about why it was behind in its payments, only to be told that it had completely paid off the bond issue months before. Soon after Holden subsequently resigned, Reeves sued him and Holden was also suspended from being a broker for a year due to his dealings with Alanar. Steven Love suffered Reeves's attempts to discredit him after Love resigned from Alanar because he came to believe that Reeves's push to sell more church bonds was not in his clients' best interest. Reeves's reckless disregard for bondholders' money was also expressed by his decision to purchase Porsche Boxsters for his three sons as a bonus. While there are some redeeming aspects of Reeves's character, the very egregious nature of his crimes and the negative aspects of his character fully justify his enhanced and consecutive sentences. Reeves has failed to establish that his fifty-four-year aggregate sentence in inappropriate.

We affirm the judgment of the trial court.

ROBB, C.J., and BARNES, J., concur.