

**FILED**

Apr 29 2015, 9:06 am

**CLERK**
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Michael R. Fisher | Gregory F. Zoeller |
| Marion County Public Defender Agency | Attorney General of Indiana |
| Indianapolis, Indiana | |
| | Michael Gene Worden |
| | Deputy Attorney General |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| James Beasley, | April 29, 2015 |
| *Appellant-Defendant,* | Court of Appeals Case No. 49A04-1406-CR-253 |
| v. | Appeal from the Marion Superior Court |
| State of Indiana, | The Honorable Kurt M. Eisgruber, Judge |
| *Appellee-Plaintiff.* | Cause No. 49G01-1210-MR-67595 |

**Brown, Judge.**

[1] James Beasley appeals his convictions for murder and attempted murder, a class A felony. Beasley raises two issues, which we revise and restate as:

I. Whether the trial court abused its discretion in admitting certain statements; and

II. Whether the trial court erred in denying his motion for mistrial.

We affirm.

### Facts and Procedural History

[2] At around eleven a.m. on August 3, 2012, James Allen drove with his girlfriend, Shantell Williams, to the home of his cousin, Gerald Beamon. Williams waited in the car while Allen went inside to speak with Beamon. Allen told Beamon that he had been involved in an altercation the night before with a man known as "Little Rock," who was later identified as Leandrew Beasley ("Leandrew"). Transcript at 129. According to Allen, also present during the altercation were men known as Levi, Little Billy, and Little Rock's brother, known as "J Rock" and later identified as James Beasley. *Id.* at 130. Allen stated that they were in a garage when he noticed Leandrew reach for a gun in his waist band, and Allen reached for the gun, punched Leandrew, and struggled for control of the gun. Allen also told Beamon that during the struggle, the gun went off and Leandrew was shot in the face. Then, Allen said, the gun would not fire anymore, and he pushed Leandrew and ran away.

[3] Allen asked Beamon to help him move some of his belongings from his home to Williams's apartment. Williams drove them to the home of a friend of hers

where they changed cars, and afterwards they drove to Allen's house to pick up his belongings. Beamon saw that Allen's home had been ransacked. They then returned to the friend's house to switch back to the original car. While Williams was inside the friend's house, Allen showed Beamon some photographs that had been taken of people at a club a few weeks earlier. Allen identified the people "he got into it with" the night before in the pictures by pointing to them in a photograph later admitted into evidence at trial as State's Exhibit 6. *Id.* at 149. Beamon looked at the pictures for "[a]bout ten minutes" and handed them back to Allen. *Id.* at 151.

[4] Williams then drove the three of them to her apartment on Emerson Avenue near 39th Street on the east side of Indianapolis, parked near a common entrance to the building, and Williams went inside. Allen removed his belongings from the car and set them on the sidewalk while Beamon sat in the rear seat on the driver's side with the door open. As Beamon was about to exit the car, he heard at first a sound like firecrackers coming from behind the car, heard the sound of loud gunfire, and saw three men walking toward the front of the car and shooting at them. Beamon recognized two of the men from the pictures that Allen had recently shown him as J Rock and Little Rock.

[5] Before exiting the vehicle, Beamon was shot in the stomach and leg. Despite the gunshots, he managed to run south on Emerson and conceal himself near some bushes in front of one of the apartment buildings. He took off his belt to use as a tourniquet on his arm and then called 911 on his cell phone. When police cars arrived, Beamon walked into Emerson Avenue, flagged down a

squad car, and told the police officer that Little Rock and J Rock shot him. Allen was killed by the gunfire.

[6] At the hospital the next day, Beamon gave a statement to Detective Leslie VanBuskirk and identified Beasley as J Rock and Leandrew as Little Rock as participants in the shooting from photo arrays.[1] After the interview, Detective VanBuskirk retrieved the photographs that the coroner had recovered from the right front pocket of Allen's pants, made blowups of them, and returned to the hospital to show them to Beamon, and Beamon identified J Rock and Little Rock in one of the blowups later admitted as State's Exhibit 178, which was a blowup of State's Exhibit 6. Detective VanBuskirk also conferred with Detective John Green, who had interviewed Leandrew on August 2, 2012, after Leandrew went to Methodist Hospital to receive treatment for a graze gunshot wound to his face.

[7] On October 17, 2012, the State filed initial informations against Beasley and Leandrew, which, as subsequently amended, charged Beasley and Leandrew with Count I, murder; Count II, attempted murder as a class A felony; and Count III, battery as a class C felony. Beasley was later arrested out of state and was extradited to Indiana. On October 30, 2013, Beasley filed a motion in limine which, in relevant part, sought to exclude as hearsay the statements made by Allen to Beamon, along with a memorandum in support of the

---

[1] Detective VanBuskirk testified at trial that she prepared photo arrays of Beasley and Leandrew based upon Beamon's statements to officers at the crime scene that he had been shot by Little Rock and J Rock.

motion. Leandrew, who was tried jointly with Beasley, filed a similar motion the same day. On November 20, 2013, the State filed its response to the motions in limine, and, following a hearing on the motions, filed a second response on January 10, 2014. The court held another hearing on the motions on February 6, 2014, and on February 21, 2014, it issued an order denying them. In the order, the court found that the statements were admissible under Ind. Evidence Rule 804(b)(3) as statements against interest.

[8] A jury trial commenced on April 14, 2014, in which evidence consistent with the foregoing was presented. At the outset of trial, the court denied a defense motion to reconsider the denial of the motions in limine. The court also overruled at trial defense counsel's objections to the admission of the evidence which was the subject of the motions in limine. Beamon testified regarding what Allen had told him about the altercation of August 2, 2012, and he identified, based on his perceptions at the scene, Beasley and Leandrew as two of the shooters on August 3, 2012. When asked to describe the moment when he witnessed the shooters approaching the vehicle, Beamon testified that "[i]t was messed up because after lookin at the pictures and then you look up and you see the people right before your eyes that was in the picture you like wow and it . . . messed me up . . . it was surreal." *Id.* at 351. He also indicated that his identification of the shooters was not "just a particular feature of the picture" and instead "was body type and face and hair and the way they were shaped . . . ." *Id.* at 352. Also, regarding the August 2, 2012 altercation, Officer Jeremy Lee testified that he interviewed Leandrew that evening at Methodist

Hospital, where he was being treated for a graze wound to the face, and that Leandrew told Officer Lee he was shot by an unknown assailant as he was walking on the sidewalk near 25th and Hillside. Detective Green testified that he interviewed Leandrew later that night at police headquarters in which Leandrew repeated a similar version of events.

[9] On April 17, 2014, the court granted a defense motion for a directed verdict on Count III, which pertained to both defendants. During deliberations, the jury submitted the following question to the court: "One of the jurors is concerned for their safety and well-being because they recognize someone in the gallery and that is influencing their decision, is there any assurance of safety we can give this juror?" Appellant's Appendix at 145. The court ordered the jury to stop deliberations and proceeded to interview each juror, beginning with the juror having the issue, Juror No. 9. Juror No. 9 told the court that she "interacted with" the person "awhile back and [] knew their face," and she believed she would "see them again or interact with them again." Transcript at 728. She stated she saw the person that day after lunch, during deliberations she could not decide on a verdict, and that when she was asked why she "expressed [her] opinion" she stated that she was concerned for her safety. *Id.* at 729. She also said that there was "[v]ery little" discussion about the issue and that she did not believe that her discussions had an influence on the jury. *Id.* She said that she "thought [her] safety might be jeopardized if [she] were not to return the right verdict" because she was "acquainted with the kind of

people that they were," referring to persons associated with the defendants. *Id.* at 733.

[10]  The court proceeded to individually question the rest of the empaneled jurors, and each juror assured the court that the statements by Juror No. 9 would not influence their deliberations. Specifically, Juror No. 2 stated that the concerns expressed by Juror No. 9 did not affect how he/she[2] viewed the case and that "it's a personal concern for her." *Id.* at 738. Juror No. 5, when asked whether the concerns expressed by Juror No. 9 would have an effect, stated "[n]o, absolutely not," that it did not change his/her "perspective in any way" and that, other than with respect to Juror No. 9, it would not change the other jurors' "ability to deliberate or their perspective." *Id.* at 743. Juror No. 6 stated that the other jurors were "just showing concern for [Juror No. 9] really." *Id.* at 746. Juror No. 10 stated: "I do not think it changed anyone's verdict." *Id.* at 753.

[11]  After speaking with the jurors individually, the court stated that it thought Juror No. 9 would be removed, but "[b]ased on every jurors' response, I'm satisfied that the rest of the jury's not tainted and I believe we can substitute alternate one in for" her. *Id.* at 760. Counsel for Leandrew moved for a mistrial, and Beasley's counsel joined in that request. The court denied their motion, reiterating that it did not believe the integrity of the jury had been

---

[2] The transcript does not indicate the gender of Jurors No. 2 or 5.

compromised, and ruled that it would remove Juror No. 9 and replace her with Alternate Juror No. 1. After replacing Juror No. 9, the court admonished the jury as follows: "We have replaced juror number nine with the first alternate juror. The reasons for the removal of juror nine and her replacement by the alternate juror number one need not be discussed and I'd admonish you from discussing any of the – the rationale behind that." *Id.* at 767.

[12] The jury found Beasley guilty on Counts I and II.[3] On May 9, 2014, the court held a sentencing hearing and sentenced Beasley to fifty-five years for Count I, murder, and twenty years for Count II, attempted murder, to be served consecutively.

## *Discussion*

## I.

[13] The first issue is whether the court abused its discretion in admitting certain statements made by Allen regarding an altercation the night before he was killed. Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. Even if the trial court's

---

[3] Leandrew was similarly found guilty on each count.

decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied, trans. denied*.

[14] Beasley argues that the court abused its discretion when it admitted the statements made by Allen to Beamon under Ind. Evidence Rule 804(b)(3) because "Allen never acknowledged any criminal responsibility on his part" and that the story repeated by Beamon "was of a man who defended himself against the attempted violent act of another person," i.e., self-defense. Appellant's Brief at 12. Beasley maintains that, in Allen's mind, Allen did nothing wrong, and accordingly there is nothing to suggest that Allen "believed he was saying something against his penal interests so as to make the hearsay statement more reliable." *Id.* Beasley notes that the "court found in its order that '… it is a stretch to suggest that the victim knew of the legal jeopardy he placed himself in by admitting his actions during the August 2 altercation.'" *Id.* He points to the Indiana Supreme Court case of *Jervis v. State*, 679 N.E.2d 875 (Ind. 1997), in which the Court "rejected the contention '… that it is sufficient if the statement merely arouses some suspicion of culpability in the factual context of the case'" and held that "[i]f the declarant does not believe the statement to be against his interest, the rationale for the exception fails." *Id.* at 14-15 (quoting *Jervis*, 679 N.E.2d at 878, 879 n.6). Beasley further argues that the error was not harmless because "[t]he sole basis to establish a motive and the primary basis for the identification of the defendants was the hearsay of James Allen through Gerald Beamon" and that "[a]bsent the connection to the

incident the night before, it is more than likely that the uncorroborated identification by Beamon would have been viewed by the jurors in a different light." *Id.* at 16. He also contends that "[t]he erroneous admission of this improper hearsay is also problematic because it renders irrelevant and, therefore inadmissible, the testimony of Detective Green regarding his knowledge about the shooting the night before." *Id.* at 17.

[15] The State argues that "[a] statement against the declarant's penal interest is one that *tends* to subject the declarant to criminal liability such that a reasonable person would not have made it unless he believed it to be true." Appellee's Brief at 9. It maintains that Allen's statement to Beamon regarding the first altercation "clearly would have exposed [him] to penal consequences had the defendants reported it to the police rather than seeking personal vengeance." *Id.* at 10. It states that "Allen's rendition of the altercation might well have provided a self-defense claim, [but] that does not equate with no criminal consequences because he could have been charged and would then have to defend himself . . . ." *Id.* at 12. The State also argues that "any error in the admission of Allen's statement to Beamon was harmless in light of the fact that Beamon clearly identified [Beasley] and [Leandrew] as two of the shooters that he observed." *Id.* at 13.

[16] In his reply brief, Beasley asserts that the State's argument controverts the Court's statements in *Jervis*, and that "[t]he erroneously admitted evidence here was the sole basis to establish motive and show a connection between Mr. Allen

and Mr. Beasley and it was the primary basis for the identification of the defendants." Appellant's Reply Brief at 6.

[17] Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). Hearsay is inadmissible unless admitted pursuant to a recognized exception. Ind. Evidence Rule 802; *see also Blount v. State*, 22 N.E.3d 559, 565 (Ind. 2014) ("Hearsay is an out-of-court statement offered for the truth of the matter asserted, and it is generally not admissible as evidence.") (internal citations and quotations omitted).

[18] The parties do not dispute that the testimony given by Beamon regarding Allen's statements were admitted for the truth of the matter asserted: that Leandrew drew a gun on Allen and a fight ensued, resulting in Leandrew being wounded in the cheek when a gunshot grazed it. The court admitted Beamon's testimony regarding the statements made to him by Allen under Ind. Evidence Rule 804(b)(3) as statements against interest. That rule provides that if a declarant is unavailable as a witness, the court may admit

> [a] statement that a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability.

[19] In *Jervis*, the Indiana Supreme Court examined the application of the statement against interest exception where defendant Jervis sought to introduce the

testimony of Marilyn Molinet to show that not he but another person, Tony Floyd, murdered Terri Boyer. 679 N.E.2d at 878-880. The court held an admissibility hearing outside the presence of the jury in which Molinet

> testified that on the morning after Boyer's body was found, Floyd told her at work that he had gone out "partying" two nights earlier (the same night Boyer was killed), picked up a woman at Frenchie's, gone "riding around" with her, and then "dumped her off" behind Newburgh Cinema around 3 or 4 a.m. Molinet also testified that Floyd told her that he knew "the best way to kill a girl" and put his hands around his own neck to indicate strangulation, and that Floyd, who appeared to be "awful nervous," asked Molinet to be on the lookout for "detective cars." Floyd did not refer to Boyer by name.

*Id.*

[20] The Court observed that the focus of the parties' arguments centered "on the extent to which a statement against penal interest must have 'so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,'"[4] that the State contended such "a statement against penal interest must be incriminating on its face to be admissible under this exception" and

---

[4] At the time of *Jervis*, Ind. Evidence Rule 804(b)(3) stated in relevant part:

> *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. . . .

We find the language in the previous rule regarding a statement which "so far tended to subject the declarant to civil or criminal liability" to be substantially similar to the current language contemplating a statement which "had so great a tendency to . . . expose the declarant to civil or criminal liability."

that "Jervis, by contrast, essentially argue[d] that it is sufficient if the statement merely arouses some suspicion as to culpability in the factual context of the case." *Id.* The Court agreed with the State that the trial court "was within its discretion in rejecting" the proffered evidence, holding that such statements "did not even 'tend to subject' Floyd to criminal liability" and "[a]t most, they cast suspicion on Floyd when paired with other information that may or may not have been known to Floyd." *Id.* The Court also instructed trial courts to be "alert to evaluate the overall reliability of the proffered statement," noting that "[r]eliability is, after all, the ultimate justification for admission of statements against interest." *Id.* The Court found that "[a]t the end of the day, the statements by Floyd [] were uncorroborated, only marginally against penal interest, and only marginally relevant." *Id.* It further noted that the record did not show that Floyd even knew a murder had occurred or that such murder was accomplished by strangulation, and it stated that, "[w]ithout knowledge of Boyer's death, Floyd could not have believed his statements to be inculpating," citing to a treatise for the proposition that, "[i]f the declarant does not believe the statement to be against his interest, the rationale for the exception fails." *Id.* at 879, 879 n.6 (quoting 4 WEINSTEIN'S EVIDENCE ¶ 804(b)(3)[02], at 804-147 (1996)).

[21]  At trial, Beamon indicated that Allen told him "that he had been involved in an altercation the night before" in a garage with "Little Rock," in which "Levi . . . . Jay Rock and Little Billy" were also present. Transcript at 129-130. Beamon testified that as Allen "turned to bend and pick something up" he observed

Leandrew "reaching in his waistband" for a gun, and Allen "reached for it and they started strugglin over it." *Id.* at 130-131. Beamon also testified that Allen told him that Allen "stoled" Leandrew, meaning that Allen "swung and punched him," and as the two men fought for control of the gun it "went off and [Allen] shot Little Rock in the face." *Id.* at 131-132. Beamon further stated that Allen told him that soon after that shot fired, "the gun wouldn't fire anymore so he pushed [Leandrew] and then started runnin." *Id.* at 132.

[22] As the Court observed in *Jervis*, the rationale for allowing statements against interest into evidence is that the declarant would only make such a statement if it were true because the content of the statement goes against the declarant's interests, and that this rationale fails if the declarant did not believe the statement *was* against his or her interest. The rules of evidence assume that such statements are reliable precisely because they are against the interest of the declarant. Here, none of the statements attributed to Allen are facially incriminating and rather suggest that Allen was forced to defend himself from an attack by Leandrew after Allen bent down to pick something up. Indeed, even the trial court in its ruling stated that "it is a stretch to suggest that [Allen] knew of the legal jeopardy he placed himself in by admitting his actions during the August 2 altercation." Appellant's Appendix at 90. Under the circumstances, in which Allen told his cousin Beamon about an episode the evening before in which he was forced to defend himself from an attack by Leandrew, we conclude that the trial court abused its discretion when it admitted such statements as statements against interest under Ind. Evidence

Rule 804(b)(3). *See Camm v. State*, 908 N.E.2d 215, 233 (Ind. 2009) (noting that the hearsay exception provided by Ind. Evidence Rule 804(b)(3) was not available because none of the statements seeking to be admitted "constituted 'an admission of a crime' or 'tended to subject [the declarant] to criminal liability'"), *reh'g denied*; *Tolliver v. State*, 922 N.E.2d 1272, 1280 (Ind. Ct. App. 2010) (noting that "as a general matter, to qualify under this hearsay exception, the statement against interest must be incriminating on its face" (citing *Jervis*, 679 N.E.2d at 878)), *trans. denied*.

[23]   This does not end our analysis, however. An error will be found harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *Gault v. State*, 878 N.E.2d 1260, 1267-1268 (Ind. 2008). In this case one of the victims, Beamon, survived the shooting and testified at trial. Beamon specifically testified that he observed the shooters approach, and he identified Beasley and Leandrew as two of the shooters. When asked to describe the moment when he witnessed the shooters approaching the vehicle, Beamon testified that "[i]t was messed up because after lookin at the pictures and then you look up and you see the people right before your eyes that was in the picture you like wow and it . . . messed me up . . . it was surreal." Transcript at 351. He indicated that his identification of the shooters was not "just a particular feature of the picture" and instead "was body type and face and hair and the way they were shaped . . . ." *Id.* at 352. He also identified both Beasley and Leandrew from photo arrays prepared by Detective VanBuskirk the day after the shooting.

[24] Also, we disagree with Beasley that the testimony of Officer Lee and Detective Green, regarding their interviews with Leandrew the night before the shooting when Leandrew sought medical attention for a gunshot wound to his face, would have been deemed irrelevant and inadmissible or otherwise prejudicial under Ind. Evidence Rule 403. Leandrew was identified at the scene by Beamon as one of three shooters who, on August 3, 2012, in broad daylight, descended upon a vehicle and fired many shots, resulting in Allen's death and serious bodily injury to Beamon. We cannot say that the fact Leandrew had on the previous night been the victim of a graze gunshot wound was irrelevant in determining whether he participated in the shooting. To meet the test for relevance under Ind. Evidence Rule 401, evidence is relevant if it "has any tendency to make a fact more or less probable . . . ." We believe this evidence meets this standard. Although standing alone the fact that Leandrew was the victim of a gunshot would not subject him or Beasley to a murder prosecution, its occurrence is certainly relevant given its proximity to the time of the shooting the following day, the manner of the shooting, and most importantly the identification at the scene of both Beasley and Leandrew by Beamon.

[25] Moreover, we do not believe Ind. Evidence Rule 403 would require its exclusion. In order for evidence to be excluded under Rule 403, "its probative value [must be] substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." In applying the balancing test of Evidence Rule 403, the trial court has "wide latitude," and its

determination is reviewed for an abuse of discretion. *Willingham v. State*, 794 N.E.2d 1110, 1116 (Ind. Ct. App. 2003). The Indiana Supreme Court has "emphasized that the relevant inquiry is not merely whether the matter is prejudicial to the defendant's interests, but whether 'it is *unfairly* prejudicial.'" *Baer v. State*, 866 N.E.2d 752, 763 (Ind. 2007) (quoting *Steward v. State*, 652 N.E.2d 490, 499 (Ind. 1995), *reh'g denied*), *reh'g denied*, *cert. denied* 552 U.S. 1313, 128 S. Ct. 1869 (2008). All relevant evidence necessarily is "prejudicial" in a criminal prosecution, and the danger of unfair prejudicial impact "arises from the potential for a jury to substantially overestimate the value of the evidence, or its potential to arouse or inflame the passions or sympathies of the jury." *Wages v. State*, 863 N.E.2d 408, 412 (Ind. Ct. App. 2007), *reh'g denied*, *trans. denied*. We believe that the court would have been within its discretion under the circumstances to rule that evidence of Leandrew seeking medical attention for a graze gunshot wound to the face on the night prior to the shooting was not unfairly prejudicial to the defendants.[5]

[26] We conclude that while the trial court abused its discretion by admitting the hearsay statements of Allen through Beamon's testimony, this error was harmless. *See Tolliver*, 922 N.E.2d at 1281 (noting that any error in admitting hearsay statements as statements against interest under Ind. Evidence Rule 804(b)(3) was harmless where independent eyewitness testimony identified

---

[5] Although the statements of Allen were inadmissible because they do not fall under an exception to the hearsay rule, we believe, as did the trial court, that they are nevertheless reliable precisely because they are corroborated by the fact that Leandrew sought medical attention for a gunshot wound to his face.

Tolliver as the shooter and other testimony linked Tolliver to the type of gun used to kill the victim).

## II.

[27] The next issue is whether the court erred in denying Beasley's motion for mistrial after Juror No. 9 told the other jurors that she recognized a person in the gallery and was concerned for her safety and well-being. A trial court is in the best position to evaluate whether a mistrial is warranted because it can assess first-hand all relevant facts and circumstances and their impact on the jury. *Ramirez v. State*, 7 N.E.3d 933, 935 (Ind. 2014) (citing *Kelley v. State*, 555 N.E.2d 140, 141 (Ind. 1990)). We therefore review denial of a motion for mistrial only for an abuse of discretion. *Id.* (citing *Gregory v. State*, 540 N.E.2d 585, 589 (Ind. 1989)). However, the correct legal standard for a mistrial is a pure question of law, which we review *de novo*. *Id.* (citing *Hartman v. State*, 988 N.E.2d 785, 788 (Ind. 2013)).

[28] Beasley argues that "[t]he prejudice caused by juror number 9 stemmed . . . from the impact of the comments she made to her fellow jurors regarding the character of this man and, implicitly, the character of the defendants with whom he associated." Appellant's Brief at 19. Beasley suggests that although "[t]he other jurors professed . . . that the comments . . . did not influence their opinion or their deliberations . . . . this would be impossible." *Id.* at 20. He argues that "[t]he egregious circumstances in this case," including the fact that the jury was "well into deliberations before [Juror No. 9] told the court about

this man she knew from the past" in violation of the jury instructions, warrant "an irrebuttable presumption" of prejudice as enunciated in *Ramirez*, and that even if the irrebuttable presumption did not apply, he is entitled to a presumption of prejudice under *Ramirez*. *Id.* at 21. He further asserts that even if no presumption applies "there has still been an adequate showing to warrant reversal" pursuant to "a probable harm standard for juror misconduct '… granting a new trial only if the misconduct is gross and probably harmed the defendant.'" *Id.* at 24 (quoting *Ramirez*, 7 N.E.3d at 939). In support of this argument, Beasley asserts that "[t]his case is analogous to cases where a juror lies on voir dire about knowing about the case." *Id.* at 25.

[29] The State contends that the concept of "an irrebuttable presumption of prejudice . . . applies only in the arena of extraneous influences on the jury, such as unauthorized contacts and communications with jurors," which did not occur. Appellee's Brief at 15. It argues that trial courts "are given significant leeway under Indiana Trial Rule 47(B) in determining whether to replace a juror with an alternate juror." *Id.* The State notes that "[r]emoval of a juror after deliberations have commenced . . . raises a number of considerations not present when a juror is removed prior to deliberations" and that in such instances "discharge of a juror is warranted only in the most extreme situations . . . ." *Id.* at 16. It states that "a trial court is in the best position to gauge the impact of a particular event upon the jury; therefore, the decision whether to grant or deny a mistrial is committed to the sound discretion of the trial court . . . ." *Id.* The State further says that "[h]ere, the remaining jurors all informed

the trial court that Juror #9's safety concerns would not have any influence on their deliberations," noting further that the court "admonished the jurors not to discuss or consider Juror #9's concerns while deliberating" which "is usually considered a sufficient curative measure so that the refusal to grant a mistrial motion is not reversible error." *Id.* at 17.

[30] In *Ramirez*, the Indiana Supreme Court set out to clarify the law regarding the various standards courts should apply on suspected jury taint, noting that previous decisions were inconsistent. 7 N.E.3d at 935. The facts of *Ramirez* are as follows:

> Five days into Ramirez's trial for murder and criminal gang activity, Juror 282 wrote a note to the trial court about an incident at her home the night before: "I was out to eat and my neighbor called me and said that the neighbor below me heard gunshots upstairs and running around and told them I was a jury member in a case." She also told the other jurors of this incident. The trial court excused Juror 282 from the jury after she said that she could not render an impartial verdict. Ramirez moved for a mistrial, arguing that Juror 282's disclosure of the incident to the other jurors "taint[ed] the whole jury" and prevented a "fair trial." After interviewing all the jurors outside the presence of the jury with counsel present, the trial court denied Ramirez's motion, finding that Juror 282's incident was coincidental and the jury could remain impartial.

*Id.* at 934.

[31] The Court discussed the historical underpinnings of Indiana's case law on the subject of when a presumption of prejudice applies, specifically discussing *Currin v. State*, which held that "'a rebuttable presumption of prejudice arises from juror misconduct involving out-of-court communications with

unauthorized persons'—but that 'such misconduct must be based on proof, by a preponderance of the evidence, that an extra-judicial contact or communication occurred, and that it pertained to a matter pending before the jury.'" *Id.* at 936-937 (quoting *Currin v. State*, 497 N.E.2d 1045, 1046 (Ind. 1986)). The Court also noted that Indiana precedent has "carved out a very narrow set of egregious circumstances in which [] prejudice . . . is not merely presumed, but automatically found; and the State will never be able to show harmless error." *Id.* at 937 (citing *May v. State*, 716 N.E.2d 419, 422-423 (Ind. 1999); *Kelley*, 555 N.E.2d at 141; *Woods v. State*, 233 Ind. 320, 323-324, 119 N.E.2d 558, 560-561 (1954)). The Court explained that this irrebuttable presumption of prejudice was "aimed at identifying egregious 'juror conduct *with witnesses occurring contemporaneous to the trial proceeding*,'" noting that such conduct was referred to in the case law as "prima facie prejudicial." *Id.* (quoting *May*, 716 N.E.2d at 422 (emphasis in original)). It then examined a number of decisions in which Indiana courts failed to apply the case law consistently. *Id.* at 938-939.

[32] In Part III, titled "Clarification of Our Precedent," the Court stated:

> Defendants seeking a mistrial for suspected jury taint are entitled to the presumption of prejudice only after making two showings, by a preponderance of the evidence: (1) extra-judicial contact or communications between jurors and unauthorized persons occurred, and (2) the contact or communications pertained to the matter before the jury. The burden then shifts to the State to rebut this presumption of prejudice by showing that any contact or communications were harmless. If the State does not rebut the presumption, the trial court must grant a new trial. On the other hand, if a defendant fails to make the initial two-part showing, the presumption does not apply. Instead, the trial court must apply the probable harm standard for juror

misconduct, granting a new trial only if the misconduct is "gross and probably harmed" the defendant. *Henri v. Curto*, 908 N.E.2d 196, 202 (Ind. 2009) (internal quotation marks omitted). But in egregious cases where juror conduct fundamentally compromises the appearance of juror neutrality, trial courts should skip *Currin*'s two-part inquiry, find irrebuttable prejudice, and immediately declare a mistrial. At all times, trial courts have discretion to decide whether a defendant has satisfied the initial two-part showing necessary to obtain the presumption of prejudice or a finding of irrebuttable prejudice.

*Id.* at 939 (certain internal citations omitted). The Court instructed trial courts to apply the presumption analysis of *Currin* according to the procedures outlined in *Lindsey v. State*, which requires courts to "immediately investigate suspected jury taint by thoroughly interviewing jurors collectively and individually, if necessary." *Id.* (citing *Lindsey v. State*, 260 Ind. 351, 358-359, 295 N.E.2d 819, 823-824 (1973)). The Court quoted *Lindsey* as follows:

If any of the jurors have been exposed, he must be individually interrogated by the court outside the presence of the other jurors, to determine the degree of exposure and the likely effect thereof. After each juror is so interrogated, he should be individually admonished. After all exposed jurors have been interrogated and admonished, the jury should be assembled and collectively admonished, as in the case of a finding of "no exposure." If the imperiled party deems such action insufficient to remove the peril, he should move for a mistrial.

*Id.* at 940 (quoting *Lindsey*, 260 Ind. at 359, 295 N.E.2d at 824). It noted that "[o]nce defendants move for mistrial, the trial courts should assess whether or not there is enough evidence to meet the two-part showing under *Currin*" and: "If so, then the presumption of prejudice applies and the burden shifts to the

State to prove harmless error. If not, then trial courts should determine whether a juror's misconduct was gross or probably harmed the defendant." *Id.*

[33] The Court held that defendant Ramirez was not entitled to a presumption of prejudice "because he failed to show that Juror 282's apartment incident was related to his case." *Id.* The Court noted that "Juror 282 herself was not sure if her status as a juror triggered the apartment incident" and that "more importantly, her own narration strongly suggests that no one even entered her apartment." *Id.* It further noted that "Juror 282's disclosure of her experience to the rest of the jury, likewise, is not an extra-judicial communication that warrants a presumption of prejudice because most believed it was 'coincidence' or 'dumb luck'—and only three jurors thought it might have been something more." *Id.* It proceeded to analyze "whether Juror 282's conduct was gross misconduct and probably harmed the defendant" and determined that it was not. *Id.* at 940-941. It specifically noted that "[i]t is not gross misconduct for a juror to discuss a possible apartment break-in with her neighbor" and that, although "[i]t may have been misconduct to discuss the incident with the other jurors," "even if it was, the trial court remedied any possible harm by interviewing and excusing Juror 282, and then individually interviewing all remaining jurors outside the presence of the jury with counsel present to assess their ability to remain impartial." *Id.* at 941. The Court concluded that "[a]ll jurors stated they could render a fair verdict, and Ramirez has given us no reason to doubt their assurances." *Id.*

[34] To the extent Beasley argues that the circumstances here warranted an irrebuttable presumption of prejudice, we find that nothing about Juror No. 9's conduct fundamentally compromised the appearance of neutrality. Again, an irrebuttable presumption is reserved for instances of egregious juror conduct involving witnesses occurring contemporaneous to the trial proceeding. Here, not only was the person concerning Juror No. 9 not a witness, but also she did not have contact with that person. We cannot say that an irrebuttable presumption of prejudice applies in this case. *Cf. May*, 716 N.E.2d at 420 (granting a new trial based on prima facie prejudice after a juror's conversation with a witness ended with an invitation for the juror to come over to the witness's house to watch a pay-per-view boxing match); *Kelley*, 555 N.E.2d at 141 (finding an irrebuttable presumption of prejudice applied after three jurors ate lunch with the State's sole witness, and the witness was overheard stating "I seen him do it," and one of the jurors responded, "I could see him do that"); *Woods*, 233 Ind. at 323, 119 N.E.2d at 560 (finding an irrebuttable presumption of prejudice where three state witnesses—two police officers and the sheriff—repeatedly visited jury members in a room where the jury congregated during recesses and intermissions).

[35] Regarding whether Beasley is entitled to a presumption of prejudice under *Currin*, we find that Beasley is not entitled to such a presumption because he failed to show that extra-judicial contact or communications between jurors and unauthorized persons occurred. Indeed, the record does not suggest that any extra-judicial contact or communications occurred at all. The record reflects

that Juror No. 9 noticed a person sitting in the gallery who she recognized and who caused concern for her safety. Beyond sitting in proximity of one another while in the courtroom, the record does not suggest any type of interaction between Juror No. 9 and the person in the gallery. In order for the *Currin* presumption to attach, the defendant must show by a preponderance of the evidence that extra-judicial contact occurred. Not having done so, Beasley is not entitled to a presumption of prejudice.

[36] We must therefore apply the probable harm standard for juror misconduct, granting a new trial only if the misconduct is "gross and probably harmed" the defendant, which we review for an abuse of discretion.[6] *See Henri*, 908 N.E.2d at 202. Beasley suggests that Juror No. 9 was guilty of gross misconduct "in that she ignored the clear and unequivocal instruction of the trial court and infected the rest of the jury with her knowledge about the man in the courtroom who was associated with the defendants" and that "[t]his case is analogous to cases where a juror lies on voir dire about knowing about the case," which "generally entitles the defendant to a new trial." Appellant's Brief at 24-25. In support, he points to Jury Instruction 20, which instructed the jury that "[i]f, at any time, you realize you know something about the case or know a witness or

---

[6] The State in its brief cites to the "grave peril" standard found in certain cases. We note that the Court in *Ramirez* mentioned that standard during its discussion of how the presumption of prejudice has previously been inconsistently applied, and it noted specifically when applying the law to defendant Ramirez that while the "trial court should have analyzed whether Juror 282's conduct was gross misconduct and probably harmed the defendant . . . [it] applied the grave peril standard instead." 7 N.E.3d at 938, 940-941. Thus, the Court appears to have abrogated the application of a "grave peril" standard in this context.

the defendant, you must inform the bailiff privately at your earliest opportunity." *Id.* at 22 (citing Appellant's Appendix at 123).

[37] Juror No. 9's statements to the other jurors that she recognized someone sitting in the gallery which made her concerned for her safety did not violate Jury Instruction 20 because her statements did not concern the facts of the case nor a witness or defendant. In evaluating whether Juror No. 9's statements otherwise constituted gross misconduct, we find that the conduct at issue here falls short of that threshold. For instance, this court found that a juror's misconduct was gross and probably harmed the defendant in *Dickenson v. State*, 732 N.E.2d 238 (Ind. Ct. App. 2000). In that case, during *voir dire*, potential juror Tammy Lane was asked whether she had a relationship with the defendant or potential witnesses that would affect her ability to be an impartial juror, and she "did not acknowledge that she had such a relationship with Dickenson, who had been her neighbor during childhood" and instead "stated that she knew a few of the potential witnesses, but that her ability to weigh the testimony of those witnesses would not be affected." 732 N.E.2d at 240. She also did not respond when asked whether she had prior knowledge about the facts of the case. *Id.* Lane was chosen as a juror, and following the verdict of guilty a member of Dickenson's family recognized her while she was being examined. *Id.* Further investigation revealed that Lane "had lied about her relationship to witness Karen Stinnett [], who was the victim's wife, and her pre-trial knowledge of the case." *Id.* On post-conviction, this court reversed and ordered a new trial, concluding that Lane's act of lying during *voir dire* constituted juror misconduct

and that "because the evidence reveals that juror Lane had knowledge of the case prior to trial, and was friendly with the victim's wife, who testified at trial . . . the misconduct was gross and probably harmed the defendant." *Id.* at 242.

[38] Here, by contrast, Juror No. 9 did not lie or otherwise make misrepresentations. She became concerned for her safety late in the trial, and she divulged her concerns during deliberations. When the court learned of her concerns, it ordered that deliberations cease and interviewed each juror individually, starting with Juror No. 9. Each of the remaining jurors assured the court that the statements by Juror No. 9 would not influence their deliberations. Juror No. 2 noted that "it's a personal concern for" Juror No. 9. Transcript at 738. Juror No. 5, stated that it did not change his/her "perspective in any way" and that, other than with respect to Juror No. 9, it would not change the other jurors' "ability to deliberate or their perspective." *Id.* at 743. Juror No. 6 stated that the other jurors were "just showing concern for [Juror No. 9] really." *Id.* at 746. Juror No. 10 stated: "I do not think it changed anyone's verdict." *Id.* at 753. The court then decided to remove Juror No. 9 and replace her with Alternate Juror No. 1 and admonished the jury by instructing them not to discuss the reasons for Juror No. 9's dismissal.

[39] Based on the foregoing, we cannot say that the court abused its discretion when it denied Beasley's motion for mistrial. *See Henri*, 908 N.E.2d at 202-204 (holding that the defendant failed to show misconduct which was gross and probably harmed the defendant based upon claims that one juror's receipt of a cell phone call created pressure to reach a hasty verdict, and that the alternate

juror communicated with the regular jurors during deliberations); *see also* *Weisheit v. State*, 26 N.E.3d 3, 13-14 (Ind. 2015) (holding that the trial court did not err in denying the defendant's motion for a mistrial after it was discovered that one of the jurors delivered cookies to the jury room baked by his wife which contained an attached note stating "Thank you for your service for the family of Alyssa [and] Caleb Lynch. I will pray for you all to have strength and wisdom to deal with the days ahead. God bless!" the court interviewed each juror individually and determined that the note had no impact on the jurors, and it removed the juror who brought the cookies and replaced the juror with an alternate).

## *Conclusion*

[40]  For the foregoing reasons, we affirm Beasley's convictions for murder and attempted murder, a class A felony.

[41]  Affirmed.

Bailey, J., and Robb, J., concur.